1                UNITED STATES OF AMERICA
               SOUTHERN DISTRICT OF ILLINOIS

2

3   DWAINE COLEMAN,            )
                          )

4             Plaintiff,   )
   v.                    ) No. 3:15-cv-898-RJD

5                         )
   JAMES VINSON, et al.,   ) Benton, IL

6                         )
             Defendants.   )

7

8

9           TRANSCRIPT OF JURY TRIAL PROCEEDINGS

10

                 TRIAL TESTIMONY OF

11               DWAINE COLEMAN

12        BEFORE THE HONORABLE REONA J. DALY
          UNITED STATES MAGISTRATE JUDGE

13

              October 2, 2018

14

15

16

17

18

19

20

21   REPORTED BY:      Christine Dohack LaBuwi, RDR, RMR
                  Official Court Reporter

22                  301 West Main Street
                  Benton, Illinois  62812

23                  (618) 439-7725
                  Christine_Dohack@ilsd.uscourts.gov

24

   Proceedings recorded by mechanical stenography, produced

25   by computer-aided transcription.

```
1    APPEARANCES:

2    FOR PLAINTIFF:      Michael J. Hickey, Esq.
                         Jerina D. Phillips, Esq.
3                        LEWIS, RICE LLC
                         600 Washington Ave., Suite 2500
4                        St. Louis, MO  63101
                         (314) 444-7600
5                        mhickey@lewisrice.com
                         jphillips@lewisrice.com
6

7    FOR DEFENDANTS:     Ann M. Spillane, Esq.
                         Brent D. Stratton, Esq.
8                        OFFICE OF THE ATTORNEY GENERAL
                         100 W. Randolph St., 12th Floor
9                        Chicago, IL  60601
                         (312) 814-3000
10                       aspillane@atg.state.il.us
                         bstratton@atg.state.il.us
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2                           WITNESSES

3      ALL WITNESSES:                                PAGE:

4        DWAINE COLEMAN for Plaintiff:
           Direct Examination by Ms. Phillips        4:17
5          Cross-Examination by Mr. Stratton         27:14
           Redirect Examination by Ms. Phillips      55:8
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Proceedings were held in open court, parties and

2    jury present.)

3          THE COURT:  You may call your first witness.

4          MR. HICKEY:  Plaintiff calls our one and only

5    witness, Dwaine Coleman.

6          THE COURT:  Mr. Coleman, if you would step up here

7    to the witness stand and be sworn before you have a seat,

8    please.

9          (Witness sworn by clerk.)

10          THE WITNESS:  My name is Dwaine Coleman.

11          THE COURT:  You may proceed.

12          MS. PHILLIPS:  Thank you, Your Honor.

13                          DWAINE COLEMAN,

14    having been first duly sworn, was examined and testifies

15    as follows:

16                        DIRECT EXAMINATION

17    BY MS. PHILLIPS:

18    Q.     Mr. Coleman, were you previously in prison?

19    A.     Yes, I was.

20    Q.     When were you released?

21    A.     I was released in July of 2017.

22    Q.     Are you currently employed?

23    A.     Yes, I am.

24    Q.     And have you maintained employment since your

25    release in 2017?

A.      Yes, I have.

Q.      Please explain to the jury your employment since you have been released from prison.

A.      When I was released from prison in 2017, I was employed through employment agencies; first in Illinois through InStaff, a few of them InStaff, then I moved to Memphis, Tennessee, through -- I'm still employed through the same employment agency that I worked for in Illinois, and I'm actually working in South Haven, Mississippi, at this time, but through that same employment agency.  But I have had other jobs during that time.

Then I worked at BB King's Blues Club and Continental Corporation in Southaven, Mississippi, also. I am currently employed at Helen of Troy in Southaven, Mississippi, as a forklift operator.

Q.      Mr. Coleman, please explain your educational background to the jury.

A.      I have some college.  I have my GED.  I went to culinary school, so I do have a culinary certification. And I have a forklift operator's permit.  And I have attended college for business, you know, but I didn't finish.  But I have attended college, I have some college education.

Q.      What is your current family situation?

A.      I have two beautiful daughters.  I have a

1    22-year-old in Nevada.  She is currently in college

2    studying law.  And I have a brand new, newborn baby.

3    She's five days old today.

4    Q.      And you currently live in Memphis?

5    A.      Yes.  I live in Memphis, Tennessee.

6    Q.      Where were you living in November 2014?

7    A.      I was incarcerated in Vienna Correctional Center.

8    Q.      Is Vienna a minimum security prison?

9    A.      Yes, it's a minimum security, low risk facility.

10   Q.      And were you transferred into Vienna from a

11   different prison on November 6, 2014?

12   A.      Yes, I was.

13   Q.      And did Vienna have a medical unit?

14   A.      Yes, Vienna had a medical unit in what's called

15   Building 19, which is -- which would be Receiving.

16   Q.      Who worked at the medical unit?

17   A.      There's doctors and nurses employed at the medical

18   unit.

19   Q.      Did Vienna have a process that allowed inmates to

20   seek medical treatment?

21   A.      Yes.  There's a -- there's a process called

22   medical request slip, where you would submit a medical

23   request for any medical issues, and it would be submitted

24   to sick call.  Or if there's -- if there's an emergency,

25   that you would tell someone and they would get you down to

1    be seen.

2    Q.      And did you seek treatment for any medical issue

3    while you were at Vienna?

4    A.      Yes, I did.

5    Q.      What were your medical issues?

6    A.      I was suffering from really severe back problems,

7    back spasms, sciatic nerve issues.  And plus, I had a very

8    severe testicle pain that was later diagnosed as

9    epidermitis.

10   Q.      And when did your back issues begin?

11   A.      I have been experiencing back problems from --

12   since 2010, but it was heightened through a car accident I

13   had in 2014 right before I was sent to prison.  So, I was

14   -- I was rear-ended in a vehicle and it really messed my

15   back up right before I went to prison.

16   Q.      When did you first request medical treatment after

17   you arrived at Vienna?

18   A.      I requested medical treatment as soon as I arrived

19   at Vienna Correctional Center.

20   Q.      Why?

21   A.      Because I was in so much pain.  I traveled from

22   what's called Stateville NRC, which is Reception, in

23   Northern Illinois, to Southern Illinois.  And it's like a

24   six, seven-hour bus ride, on a bus shackled down with hard

25   seats.  So, the long bumpy ride, it really aggravated my

```
 1    medical issues.  So, I immediately sought medical
 2    treatment.
 3    Q.      And how did you request treatment at that time?
 4    A.      Well, when we were taken through Intake, I
 5    requested medical treatment.  I told -- they ask you, "Are
 6    there any medical problems?"  And I related my medical
 7    issues.  So, what was done was, my blood pressure was
 8    taken and they referred me to what's called nurse's sick
 9    call.  So, I was referred to nurse's sick call.
10    Q.      Okay.  At nurse's sick call, did you see a nurse?
11    A.      Yes.
12    Q.      Okay.  What treatment did the nurse provide you at
13    that time?
14    A.      The only treatment I provided was -- they
15    essentially didn't treat me.  They took my blood pressure
16    and then they referred me to doctor sick call.
17    Q.      And did you see a doctor?
18    A.      Yes.
19    Q.      What treatment did that doctor provide?
20    A.      The doctor didn't prescribe -- he looked at me,
21    the doctor told me to drink more water and exercise.
22    Q.      And how did you feel, that that was the reaction
23    to your severe pain?
24    A.      I was -- I was shocked.  He basically did a, what
25    we would call a drive-by examination and told me to just
```

1    drink more water and exercise, and dismissed my pains.

2    Q.      And at some point did you receive any

3    over-the-counter medication?

4    A.      Yes.  I did receive Ibuprofen.  I believe it was

5    200 milligram Ibuprofen.

6    Q.      And were you still in pain about two weeks later,

7    on November 17, 2014?

8    A.      Yes.  I was in constant pain.

9    Q.      Did you try to take that Ibuprofen to reduce your

10   pain?

11   A.      Yes, I did.

12   Q.      Please explain to the jury what happened when you

13   tried to take the Ibuprofen.

14   A.      Well, I was in Building 19, as you heard.  It was

15   a dormitory situation.  But at the time, I believe the

16   facility was on lockdown so we couldn't move freely.  So,

17   I had to ask permission to use the restroom or get water.

18   So, I went to the officer's desk and I was speaking to one

19   particular officer and asked him permission to get water

20   to take my medication.

21         And Officer Dent, he was standing there, and he

22   rudely interrupted my conversation with the one officer

23   and aggressively told me to *go sit back down, you are not*

24   *getting nothing.*

25         So, I tried to explain to the officer that, you

```
1    know, I'm in severe pain.  I -- please let me take, you

2    know, my medication, you know.  But Officer Dent, he was

3    very, very aggressive, and refused to allow me to get the

4    water to take my medication.  So, I was in a state of

5    agitation so I declared a crisis so I can be seen for my

6    issues.

7    Q.     And can you explain to the jury what you mean when

8    you say you "declared a crisis"?

9    A.     Well, I declared an emergency situation.  When you

10   declare a crisis, it's like an emergency situation where

11   you need medical -- immediate medical attention.  You

12   know, I was in that much pain that, you know, I needed to

13   be seen, so I declared a crisis.  And when I declared a

14   crisis, an Acting Sergeant came to speak to me.  And he

15   basically told me that I would be placed in segregation if

16   I continued requesting a crisis, so...

17   Q.     What happened after that?

18   A.     Well, after that, Lieutenant Mitchell came to

19   speak to me.  And Lieutenant Mitchell basically repeated

20   the same thing.  He told me that -- he told me to go

21   upstairs and file a grievance like everybody else because

22   if you insist on requesting a crisis, I'm going to place

23   you in segregation.

24   Q.     Did you make any complaints to Lieutenant

25   Mitchell?
```

1    A.      Yes.  I complained to Lieutenant Mitchell.  When I

2    spoke to Lieutenant Mitchell, I complained to Lieutenant

3    Mitchell about Officer Dent's aggressive behavior and

4    refusal to allow me to take water for my medication.  But

5    Lieutenant Mitchell, he ignored those complaints and

6    basically sided with the officer and, you know, ignored my

7    pain.

8           And reinforced that by telling me that if I insist

9    on, you know, declaring a crisis, an emergency situation

10   to be seen for my pain, I would be placed in segregation.

11   Q.      And what happened next?

12   A.      I told Lieutenant Mitchell that I'm in such pain

13   that you're going to have to do what you have to do

14   because I can't deal with this pain.  So, Lieutenant

15   Mitchell placed me in segregation after I told him I wish

16   to continue with the crisis.

17   Q.      Please explain to the jury what segregation is.

18   A.      Well, segregation is the part of the institution

19   where they isolate you from the general population.  It's

20   usually used for disciplinary reasons.  I was isolated,

21   taken to segregation and, you know, taken away from -- you

22   lose your privileges.  You know, you are locked in a cell

23   23 hours a day and you have no freedom of movement.  You

24   know, you are just stuck in a cell 23 hours a day, looking

25   at the walls.  No property.  They take your property from

1    you.

2    Q.      How did being in segregation make you feel?

3    A.      It was very -- it was very, very depressing.   And

4    I was -- I was in pain and confused at the same time

5    because the only thing I was trying to do was get

6    treatment for my pain, so.   Being thrown in segregation

7    for trying to get treatment for pain was -- it threw me

8    for a loop, you know.   It was, it was like torture.

9    Q.      And how long did you stay in segregation?

10   A.      I basically stayed in segregation my duration at

11   Vienna Correctional Center, you know, and, you know, the

12   experience in segregation was -- it was horrible.   You

13   know, I had to endure officers -- like segregation,

14   inmates get loud in segregation sometimes, so there will

15   be officers who would open the windows in the middle of

16   the wintertime at night and turn industrial strength fans

17   on and freeze us out at night, because other inmates --

18   basically everyone was suffering for a couple inmates that

19   wouldn't be quiet.   So, there were various mentally ill

20   inmates who act out, scream, stuff of that nature, so

21   basically everyone would have to suffer.   You know, the

22   officer, they open the windows to freeze us, and turn the

23   fans on at night.   It was basically torturous.

24   Q.      Did you receive a disciplinary ticket because of

25   the incidence on November 17, 2014?

1    A.      Yes, I did.

2    Q.      Do you recall what the disciplinary ticket was

3    for?

4    A.      The disciplin -- I received a disciplinary ticket

5    for disobeying a direct order and insolence, I believe.

6    Q.      And why do you think you received that

7    disciplinary ticket?

8    A.      I received a disciplinary ticket to cover up for

9    the fact that Lieutenant Mitchell retaliated against me

10   for refusal -- for requesting medical attention and

11   declaring a crisis, so they had to justify the reason to

12   place me in segregation.

13   Q.      Okay.  I want to move on.  When did you first

14   encounter Lieutenant Vinson?

15   A.      When I first encountered Lieutenant Vinson, I

16   believe he did a walk-through in segregation.  And I was

17   complaining to Lieutenant Vinson about his officers'

18   behavior of opening the windows and turning the fans on

19   and freezing us at night.  And Lieutenant Vinson basically

20   told us that his officers can do what they want to do,

21   whatever they want to do.

22   Q.      And do you recall about when you had this

23   interaction, this first interaction with Lieutenant

24   Vinson?

25   A.      I don't recall the exact time, but I know it was

1    when I was placed in segregation by Lieutenant Mitchell.

2    Q.      Okay.  Okay.  Now, when did your next encounter

3    with Lieutenant Vinson occur?

4    A.      I believe my next encounter with Lieutenant

5    Mitchell was --

6    Q.      Lieutenant Vinson.

7    A.      Lieutenant Vinson.  I'm sorry.  Lieutenant Vinson.

8    I was still -- during all this time, I was still in pain

9    from my medical issues.  I still had -- wasn't properly

10   treated.  So, I was still requesting medical treatment and

11   still being ignored.  So, I had to take extreme measures

12   and I flooded my cell.

13           First, I declared a hunger strike.  Refusing to

14   eat.  But when I -- you know, when I declared the hunger

15   strike and refused to eat, the officers would try to shove

16   food in my cell to make it seem like I was eating so they

17   wouldn't have to report it.  Because when you declare a

18   hunger strike and, I believe, don't eat for 72 hours,

19   Springfield have to be notified.  So, they were trying to

20   shove food in my cell to make it look like I was eating so

21   they wouldn't have to notify the state capital that, you

22   know, there was an issue going on.

23           So, I flooded my cell, you know, because

24   segregation is small so they -- it's separated from the

25   rest of the prison so it's kind of isolated.  So, what

```
1    goes on down there don't -- doesn't get out to the

2    higher-ups.

3         So, I flooded my cell in order for what's called

4    an incident report to be written, you know, so it can get

5    out and not be contained just among the unit, so the

6    higher-ups could be notified, you know.  That's the

7    desperation of where I was at.

8  Q.    What happened after you flooded your cell?

9  A.    When I flooded my cell, Lieutenant Vinson, he came

10   and took me out and took me to the shower, you know.  And

11   when he came to get me and took me out, he squeezed the

12   handcuffs on my handcuff -- I had to reach backwards to

13   get handcuffed through what's called the chuckhole, so I

14   had to reach backwards with my hand and put my hands

15   through the back.  So, when Lieutenant Vinson handcuffed

16   me, he squeezed so tight with the handcuffs, it cut into

17   my wrists and, you know, sprained my wrist.  My wrist was

18   swollen and cut into.  And he was yanking my arms

19   backwards at the same time.

20        And he took me out of the cell and placed me in

21   the shower where, once again, it was like November, so it

22   was very cold.  So, he placed me in the shower.  And I had

23   a jumpsuit on with no T-shirt or anything, and they had

24   the window open.  So, I was handcuffed in the shower

25   behind my back, you know, the pressure on my shoulders,
```

1    extreme pain, still requesting medical attention.

2          And they had me in the shower with the window

3    open, freezing for over an hour.  And during this time I

4    was in the shower, Lieutenant Vinson, he had -- at first,

5    before I left the cell, I placed my property -- because I

6    did get limited property.  So, I placed it in what's a

7    pillowcase, my important things, my family photos, my

8    letters, things of that nature, and so I placed them in

9    the pillowcase.  And Lieutenant Vinson went in the cell

10   and threw my personal belongings in the toilet water, you

11   know.

12         Now, you already get limited possessions in

13   prison, so when they intentionally destroy something like

14   that, it's devastating, you know.  You have your pictures,

15   your -- my letters from my daughter and stuff, so...

16   Q.      Do you need moment, Mr. Coleman?

17   A.      No.   (Pause.) When I was in segregation, it was --

18   there's two parts to segregation.  There's a upstairs

19   unit.  And Lieutenant Vinson had the upstairs unit in

20   segregation cleared out, to place me up there by myself to

21   -- in order to do further harm to me.  So, I heard him and

22   another officer discussing moving the other inmates out of

23   the segregation unit upstairs, to place me up there so I

24   would be isolated, you know, because there was other

25   inmates in the segregation unit downstairs.  So they, they

1   were plotting to send me upstairs and I was really scared

2   for my life.

3   Q.      And were you escorted upstairs?

4   A.      Yes.

5   Q.      Okay.  And what happened after you were escorted

6   upstairs to the segregation unit?

7   A.      When I was escorted upstairs, they placed me in

8   the cell once again.  You know, Lieutenant Vinson was

9   digging into my wrists and stuff with the cuffs and

10  handling me real rough.  So, he placed me in the cell and

11  he told me "I'll be back" in a threatening manner.  You

12  know, I'm looking around, there's no one in here, you

13  know, so my -- I'm in real fear of my life.  So, I told

14  him I was feeling suicidal in the presence of another

15  officer.

16          Lieutenant Vinson, he initially ignored me.  But

17  the other officer was like, *Now we gotta take him*

18  *downstairs, he declared he's suicidal.*  So, I was taken to

19  the nurse's unit.

20  Q.      And what happened after you were taken to the

21  nurse's unit?

22  A.      Well, before I even went to the nurse's unit to

23  tell them what was going on with me, Lieutenant Vinson

24  had, had already went in and told the nurses, you know,

25  prejudiced their minds towards me.  And told them, *He's,*

1    *he's just causing trouble, nothing's wrong with him*, but

2    -- you know, so when I went into the nurse's unit, the

3    nurses automatically had attitude towards me, like the

4    nurse -- one nurse, she said, *I'm probably more of a man*

5    *than you are*, you know.

6          So, you know, I'm in pain.  I'm upset.  You know,

7    so I responded, you know, that you probably are.

8          So when I said that, Lieutenant Vinson became real

9    agitated and upset, you know, and tried to strike me.  And

10   the other escorting officer, he stepped in front --

11   between me and Lieutenant Vinson and told him, you know,

12   *it's not worth it, don't do it*.  And that was the first

13   time that Lieutenant Vinson tried to attack me.

14   Q.    Can you explain what happened after that incident?

15   A.    Well, after that incident, I was placed in what's

16   called a crisis cell, where I'm under constant watch, you

17   know, due to my declaration of a crisis.  So, they had me

18   on, I believe, a 10-minute watch or something like that,

19   where I would be watched like every 10 minutes or

20   something.

21         And I declared a hunger strike, also, so they had

22   to monitor me, my eating, and see if I ate or anything.

23   So, with the hunger strike, there's a hunger strike

24   protocol that, if you don't eat after 72 hours, you have

25   to do a hunger strike assessment.

1    Q.      Can you explain to the jury why you declared a

2    hunger strike?

3    A.      Well, I declared a hunger strike because my level

4    of desperation of the harm towards me, the pain I was in.

5    I was just desperate for -- you know, to be seen and be

6    treated, you know.  You know, in pain and in fear at the

7    same time.

8    Q.      What was the next time you encountered Lieutenant

9    Vinson?

10   A.      The next time I encountered Lieutenant Vinson was

11   when I was taken to be seen for the hunger strike

12   physical.

13   Q.      Was this on January 3rd, 2015?

14   A.      Yes.

15   Q.      Did any other officer escort you, along with

16   Lieutenant Vinson?

17   A.      Yes.  There was Lieutenant Vinson and another

18   officer.  I believe Officer Blessing at the time.

19   Q.      And can you explain to the jury what happened

20   during the assessment they took you to?

21   A.      Yes.  I was taken to the medical unit so they can

22   do the hunger strike physical.  And, you know, Lieutenant

23   Vinson is in there doing the same thing, telling the

24   nurses, interfering with the medical treatment, you know.

25   And I told Lieutenant Vinson that, *You're only security,*

1   *you know, you can't interfere with my medical treatment,*

2   *you know.*

3       And he got irate and, you know, the nurse, she

4   refused to complete the full hunger strike protocol.  So,

5   I told the nurse that I would write her up for refusing to

6   follow hunger strike procedures, you know.  So, Lieutenant

7   Vinson got angry and snatched me away out of the nurse --

8   the medical unit.  And en route to, back to the crisis

9   cell area -- the crisis cell area is like in a hallway and

10  there's a door leading to that hallway.

11      So, Lieutenant Vinson has me handcuffed, secured

12  very tightly, because every time he got me in handcuffs,

13  he's clenching down on my handcuffs and wrists.  So, he

14  got me, you know, escorting me back.  And when we get to

15  the entrance of the crisis cell area, he slams my head

16  against the doorjamb, right there -- (indicating) -- and I

17  immediately fell on the floor screaming in pain.  So, he

18  -- they snatched me up, threw me in the cell.  And I had

19  to, once again, put my arms backwards out of the cell so

20  he could take the handcuffs off me.

21      So, he clenched down, cut into my wrists with the

22  handcuffs again, squeezed real tightly like he was

23  wrenching my arms back like he was really trying to break

24  them in that manner.  And, you know, I'm screaming in pain

25  the whole time.

```
 1              So, I believe the nurse thought about when I told
 2   her I would write her up for not following hunger strike
 3   procedure, so she came back to take a urine sample, which
 4   was the next step of the hunger strike procedure, to
 5   take a urine sample to see if I had, I believe, any
 6   proteins in my urine or anything.  And when the nurse came
 7   in, you know, I could feel my forehead swolled up
 8   instantly, so I could feel a big knot on my forehead
 9   swolled up instantly.  So, during the incident, I told the
10   nurse, I said, hey, I was just assaulted, I need medical
11   attention.  So, when I told the nurse I need medical
12   attention, Lieutenant Vinson, I believe, he grabbed me by
13   my mouth like this -- (demonstrating) -- and clenched my
14   jaw, you know, so I couldn't speak.  And Lieutenant -- and
15   Officer Blessing, he grabbed me around my throat and
16   choked me while I'm handcuffed behind, behind my back.
17              And the nurse -- you know, I'm asking for medical
18   attention because right now I have a big knot on my
19   forehead and they broke my -- he broke my tooth when he
20   slammed me into the doorjamb.  So, the nurse is ignoring
21   my obvious medical distress because Lieutenant Vinson had
22   already poisoned her against me.
23              So, what she -- she just, you know, pulled down my
24   pants and took the urine sample and left.
25   Q.      Did you report this incident to anyone?
```

```
 1   A.      Yes, I did.

 2   Q.      Who did you report it to?

 3   A.      It was close to shift change so -- third shift was

 4   coming in.  So I, I reported to Lieutenant -- I believe

 5   his name was Lieutenant Oehlsen, immediately after it

 6   happened.

 7   Q.      And what happened after you reported this to

 8   Lieutenant Oehlsen?

 9   A.      Well, Lieutenant Oehlsen, he said -- he told me it

10   was investigated and that he -- Vinson was denying

11   anything.  And the nurse had already denied anything

12   happening, you know.  So I didn't -- I had to, I believe,

13   further report it through the grievance procedure.

14   Q.      Okay.  And were you moved to a different cell

15   after this incident?

16   A.      Yes, I was moved to the Health Care Unit and I was

17   placed in, basically placed in a cage with just a cot.  It

18   was just a cage and a bed.

19   Q.      And what happened after you were placed in this

20   cell?

21   A.      When I was placed in that, in that area, the

22   Assistant Warden Love came and talked to me, and he was

23   asking me what was going on.  And I told him I had -- I

24   reported, I told him about being assaulted, not being

25   treated for my medical issues, and that was -- that I was
```

1    in very, very -- so much pain and a lot of distress.  So,

2    Lieutenant Warden -- I mean -- Warden Love told me he

3    would talk to the head warden, which is Warden Hilliard.

4          So, I believe Warden Hilliard came to visit me the

5    next day.  And I told Warden Hilliard what was going on

6    and Warden Hilliard told me, he was like, *Hey, I smell a*

7    *rat.*  So he was like, *what do you want?*  I told him, I

8    said, *I want to be transferred.  I fear for my life.  I*

9    *need to get out of here.  I want to be transferred.*

10   Q.      And were you ultimately transferred?

11   A.      Yes, I was.

12   Q.      What prison were you transferred to?

13   A.      I was transferred to Pontiac Correctional Center.

14   Q.      And did you seek any medical treatment for the

15   injuries you sustained during that assault?

16   A.      Yes, I did.

17   Q.      Okay.  What medical treatment did you seek?

18   A.      I -- I put in what's called a request -- medical

19   request slip again in Pontiac, and I was eventually seen

20   by the medical staff at Pontiac.  And I was seen for my

21   original injuries that I had suffered, that I was

22   complaining about.

23   Q.      Were you seen by a dentist at Pontiac?

24   A.      Yes, I was seen by a dentist.

25   Q.      Why?

A.      They took X-rays of my mouth because my tooth was

broken by the assault by Lieutenant Vinson.

Q.      Do you recall the name of your dentist?

A.      Not offhand.  I know I saw it, but --

Q.      Do you recall the date you saw the dentist?

A.      Not the exact date.

Q.      Would your dental record refresh your memory?

A.      Yes, it would.

        MS. PHILLIPS:  I'd like to approach and hand him

what's been marked as Exhibit A.

        THE COURT:  You may.

Q.      (BY MS. PHILLIPS)  Take a moment to review that.

A.      Okay.  (Pause.)  Yes.  The dental record reflects

the dentist's name was Jerome Mitchell.  And I was seen by

him on January 20 of 2015.

        MS. PHILLIPS:  Your Honor, I'd like to offer into

evidence Plaintiff's Exhibit A.

        THE COURT:  Any objection?

        MR. STRATTON:  No objection, Your Honor.

        MS. PHILLIPS:  Your Honor, may I publish this to

the jury?

        THE COURT:  Sure.  It will be admitted.

Q.      (BY MS. PHILLIPS)  Dwaine, if you could look up

this way.  Does this reflect the name of your dentist,

Jerome Mitchell?

1    A.      Yes.

2    Q.      And January 20, 2015, reflects the date that you

3    saw the dentist --

4    A.      Yes.

5    Q.      -- at Pontiac?

6    A.      Yes, it does.

7    Q.      Does this reflect your chipped tooth?

8    A.      The top portion of it was the injury I suffered at

9    the time.

10   Q.      So this --

11   A.      Yes, No. 9.

12   Q.      No. 9 reflects your chipped tooth that you

13   sustained during the assault?

14   A.      Yes.

15   Q.      Now, was your tooth ultimately fixed?

16   A.      Yes, it was.

17   Q.      Okay.  Do you recall when your tooth was fixed?

18   A.      Well, when I was transferred to Hill Correctional

19   Center, I was seen by a dentist.  Usually, the Department

20   of Correction, they don't do what's called cosmetic

21   dentistry but, you know, I had a sympathetic dentist who,

22   who was sympathetic to my plight, so he chose to go ahead

23   and fix the tooth.

24   Q.      How did the assault by the hands of Lieutenant

25   Vinson and Blessing affect you?

A.      It, it really terrified me, you know, because, you

know, you look at these guys as people who will protect

you from other inmates or other harm in prison, you know,

and they're the ones that's creating the harm, so it, it

really terrified me.  I was in constant pain and constant

fear, you know.  I actually feared for my life, you know,

in their hands.

        So, you know, mentally and emotional --

emotionally, you know, it caused a lot of hurt, you know,

a lot -- a lot of pain, you know, because you would never

expect this from authority figures.

        You know, I kinda likened it to a defenseless

child being abused by his babysitter, you know.  You know,

because, you know, you're helpless in that situation, you

know, if you have no freedom of movement.  You are

handcuffed.  You are beaten.  So, you are basically at

their mercy so it, it deeply affected me and, you know, I

have -- I have issues today that I'm dealing with, you

know, due to the -- you know, my treatment by these

individuals.

        So, you know, my family life is not perfect

because I have emotional issues, detachment issues, you

know, so it -- it was a strange situation that was very

torturous, mentally, emotionally and physically.

Q.      Why did you file this lawsuit?

1    A.      I filed this lawsuit to bring the situation to

2    light.  You know, I wanted to bring, bring this out

3    because I don't want anybody else to have to go through

4    what I went through for making a mistake.  I made a

5    mistake and I was paying for my mistake by my, my

6    punishment.  So, I just wanted to bring it to light so

7    nobody else would have to suffer for making a mistake in

8    life.

9         MS. PHILLIPS:  Your Honor, nothing further right

10   now.

11        THE COURT:  All right.  Cross-examination?

12        MR. STRATTON:  Yes, Your Honor.

13                    CROSS-EXAMINATION

14   BY MR. STRATTON:

15   Q.      Good morning, Mr. Coleman.

16   A.      Good morning.

17   Q.      So, on November 17, 2014, you were in Building 19;

18   correct?

19   A.      Yes, correct.

20   Q.      And the building was on lockdown -- the whole

21   prison was on lockdown at that point; correct?

22   A.      I'm not sure if the whole prison was, but I know

23   Building 19 was.

24   Q.      Right.  And when it's on lockdown, that means

25   there's less movement.  There's more restriction.

```
 1    A.      Yes.
 2    Q.      And the officers have to pay more attention to
 3    movement because it's on lockdown?
 4    A.      Yes.
 5    Q.      And so the officers are entitled to have control
 6    over the inmates in there, so they make sure they keep
 7    everybody under control?
 8    A.      Yes.
 9    Q.      So, it was -- and at the time, you were on the
10    west wing of the second floor?
11    A.      I'm not sure, west wing or --
12    Q.      Okay.  But it was, it was kind of a big room like
13    a dormitory?
14    A.      Yes.
15    Q.      With beds lined up?
16    A.      Yes.
17    Q.      And there was, what, 100, 150 inmates in that room
18    at one time?
19    A.      It was over 100.
20    Q.      Over 100.
21    A.      Yes.
22    Q.      Okay.  And you'd agree that the officers are the
23    ones who get to decide which inmates get to move and when?
24    A.      Yes.
25    Q.      And they need to do that because they need to
```

1    maintain control over that large number of inmates?

2    A.     Yes.

3    Q.     And, and that movement even includes going to the

4    washroom behind the officer's desk on the second floor?

5    A.     Yes, correct.

6    Q.     Okay.  And, and I think you described that you --

7    there's a system where you get a pass to go to certain

8    parts of the prison?

9    A.     Yes.

10   Q.     And, and you knew what that system was; right?

11   A.     Yes, I did.

12   Q.     You knew there were times when you needed to get a

13   pass to go from where you were in the dormitory to another

14   part of the facility?

15   A.     Yes, I did.

16   Q.     Okay.  And that you had to request that pass from

17   a correctional officer?

18   A.     Yes.

19   Q.     And the officer may say no, for some reason?

20   A.     Yes.

21   Q.     Maybe it was during a shift change, that might be

22   a reason?

23   A.     It could be.

24   Q.     Or, or it might be during a meal time where

25   they're moving a lot of inmates, or a certain reason?

```
 1    A.      It's possible.

 2    Q.      Okay.  So, on that day, November 17, you went up

 3    to the desk on the second floor about 8:00 a.m. in the

 4    morning; right?

 5    A.      I believe.

 6    Q.      Okay.  And, and that's when you had the encounter

 7    with Officer Dent?

 8    A.      Yes, it was.

 9    Q.      Now, you had had breakfast earlier that morning;

10    right?

11    A.      They served breakfast but I don't know if I went

12    or not.

13    Q.      But you would have had access to water or some

14    liquid during breakfast that morning --

15    A.      Yes.

16    Q.      -- to take your Ibuprofen?

17    A.      Yes.

18    Q.      Okay.  And then lunch would be a little bit,

19    probably not noon, but obviously late morning?

20    A.      Yes.

21    Q.      And you would have had the opportunity to take

22    your Ibuprofen with lunch and the water or some liquid

23    during lunch?

24    A.      Yes, if I was needing it at the time.

25    Q.      Okay.  But you went up to -- well, let me say:
```

1    You have testified that you wanted water.  You really

2    wanted to go to the Health Care Unit, didn't you?

3    A.      No.  At the time, I was trying to take my

4    medication because I needed it at that time.

5    Q.      Okay.  So, at that moment you were not looking to

6    go to the Health Care Unit?

7    A.      No.

8    Q.      Okay.  So, you go up to the desk, and Officer

9    Dent's there and Officer Cabot is there; correct?

10   A.      If that's the other officer, yes.

11   Q.      And Lieutenant Mitchell was not at the desk?

12   A.      No, he wasn't.

13   Q.      And you told Officer Dent that you had a pass?

14   A.      No.  I was speaking to Officer Cabot, and Officer

15   Dent rushed in and rudely interrupted my conversation with

16   Officer Cabot.

17   Q.      Okay.  So, you told officer Cabot that you had a

18   pass?

19   A.      If that was the situation, probably.

20   Q.      And Officer Dent said -- or maybe it was Officer

21   Cabot -- said, *No, you don't have a pass*.

22   A.      No, Officer Cabot, you know, was conversating with

23   me.  And he didn't get a chance to tell me anything before

24   Officer Dent rudely interrupted our conversation.

25   Q.      But they keep a list of everyone who has a pass

1  there at the desk; right?

2  A.      Correct.

3  Q.      And so they could check.  If you said, *I have a*

4  *pass*, they could look at the list and say, *No, you don't*

5  *have a pass.*

6  A.      They can check and see if I have a pass, yes.

7  Q.      Okay.  Well, Officer Dent said -- forget about the

8  pass at this point.  He said, *Go back to your bunk*; right?

9  A.      Very aggressively.

10  Q.      Okay.  And you did not go back to your bunk?

11  A.      I told Officer Dent, I believe, that I'm in pain,

12  I need to see a crisis team if they won't allow me to take

13  my medication because I'm in that much pain.

14  Q.      But you did not go back to your bunk?

15  A.      I did.  I did go back to my bunk.

16  Q.      The first time he asked, you went back to your

17  bunk?

18  A.      I went to -- I went back to the bunk after I told

19  him I was in pain and I needed to see the crisis team.

20  Q.      In fact, he asked you to go back to your bunk four

21  times before you went back to your bunk.

22  A.      No, that's in his report.  It wasn't four times.

23  That's what, that's what he put in his report.

24  Q.      That's what he put in his report; right?

25  A.      Yes.

```
 1   Q.      And that's a lie?

 2   A.      Yes, that's a lie.

 3   Q.      And that's part of the coverup?

 4   A.      That's part of the coverup for them putting me in

 5   segregation, yes.

 6   Q.      Okay.  Well, it's also in his report that you

 7   started to get real loud in front of the other inmates.

 8   A.      No, that's also a lie.

 9   Q.      That's also a lie.

10   A.      Yes.  Because I was, I was in the hall and the

11   other inmates were still in the dorm, so.

12   Q.      So, are you saying today that you did not ignore

13   or disobey a direct order from Officer Dent?

14   A.      Yes, I am.

15   Q.      You did not disobey a direct order?

16   A.      He told me to go back to the dorm when I was

17   talking to the other officer.  I told Officer Dent that I

18   was talking to this officer --

19   Q.      Okay.

20   A.      -- you know, so.

21   Q.      So, eventually you do go back to the bunk --

22   A.      Yes.

23   Q.      -- right?  And that's when, that's when Lieutenant

24   Mitchell comes to talk to you?

25   A.      No.  He comes after I declared a crisis, and he
```

1    was the first one that came.

2    Q.      Okay.  But let me, let me talk about when

3    Lieutenant Mitchell came to talk to you.  Were you at your

4    bunk at that point?

5    A.      No.  They called me back into the hallway.

6    Q.      Oh, they called you back into the hallway.  It was

7    in the area near the desk?

8    A.      Yes.

9    Q.      And you told Lieutenant Mitchell that you were not

10   getting proper medical treatment in the Health Care Unit;

11   correct?

12   A.      I told, I told Lieutenant Mitchell, yes, that I

13   needed -- when I first called Lieutenant Mitchell, I told

14   him about the medical treatment and also Dent's behavior

15   towards me, and that I need -- I am currently in crisis

16   because I can't deal with the pain I'm in.

17   Q.      And when, when an inmate declares a crisis, they

18   have to ask the crisis team to respond to that; correct?

19   A.      Yes, correct.

20   Q.      And when you told Lieutenant Mitchell that you

21   weren't getting the proper treatment from the Health Care

22   Unit, he told you to send a request to the Health Care

23   Unit; right?

24   A.      No.  I told Lieutenant -- when I declared a

25   crisis, Lieutenant Mitchell was supposed to act upon that

1    crisis.

2    Q.      Okay.  But you are saying that Lieutenant Mitchell

3    did not tell you, *if you are not getting proper healthcare*

4    *treatment send a request to the Health Care Unit*?

5    A.      I'm telling you Lieutenant Mitchell told me that

6    if I insist on declaring a crisis, he's going to throw me

7    in segregation.

8    Q.      So, he told you you were getting a disciplinary

9    ticket; correct?

10   A.      He didn't say anything about a disciplinary

11   ticket, at first.  He just told me that if I wanted to

12   declare a crisis, he's going to throw me in segregation.

13   Q.      But eventually he told you you were getting a

14   disciplinary ticket.

15   A.      I believe eventually, you know, I got one.

16   Q.      Right.  You know you got one; right?

17   A.      Yeah.

18   Q.      You got it delivered to you about two days later.

19   A.      Yeah, because, you know, it was kind of odd

20   because in a normal situation if you -- a lockdown

21   situation, if you disobey a direct order, you immediately

22   get placed in handcuffs and taken away.  But I didn't go

23   to segregation until after Lieutenant Mitchell told me he

24   would take me to segregation if I declared crisis on --

25   crisis.  So, it was kind of odd that if I really disobeyed

1    a direct order, why was I not taken right away?  As they

2    always do.

3    Q.      So you were -- you were taken to temporary

4    confinement; right?

5    A.      Yes.

6    Q.      And you understand that, under the prison rules,

7    an inmate can be in temporary confinement until they get

8    their hearing in front of the adjustment committee.

9    A.      Yes, correct.

10   Q.      Okay.  And you did get a hearing in front of the

11   adjustment committee; correct?

12   A.      Yes.

13   Q.      And that was on November 21st; correct?

14   A.      I don't remember the exact date.

15   Q.      Approximately that date?

16   A.      Approximately, yeah.

17   Q.      Okay.  And you know that that's what the rules

18   provide, is that, is that a hearing -- if it's a major

19   infraction like disobeying a direct order, you are

20   entitled to a hearing?

21   A.      Yes.

22   Q.      And you got your hearing?

23   A.      Yes.

24   Q.      And you were found guilty of disobeying a direct

25   order?

1    A.      Yes.

2    Q.      And the punishment was five days in segregation;

3    right?

4    A.      I believe, yes.

5    Q.      And you were released from segregation on November

6    21st, right after the hearing; correct?

7    A.      I believe so.

8    Q.      Okay.  So, earlier when you said you were in

9    segregation for the rest of your time in Vienna, you

10   actually got out of segregation on November 21st.

11   A.      Well, I got out, but I was basically -- I was

12   basically in segregation for my whole duration at Vienna.

13   Q.      Okay.

14   A.      I got out that day, but basically the whole

15   duration for requesting medical attention.

16   Q.      Okay.  Now, let me go back for a moment to

17   November 17.  You were -- before you went to segregation,

18   before you went to temporary confinement, you visited with

19   one of the social workers; correct?

20   A.      My memory is not -- I'm not -- I may have talked

21   -- I don't know which date but I did talk to a social

22   worker, yes.

23   Q.      Do you remember a social worker by the name of

24   Tracy Smith?

25   A.      Tracy Smith?  I don't know if that's her exact

1    name but I talked to a social worker.

2    Q.     Okay.  So -- and the social worker would have come

3    to where you were, if you were at the bunk, before you

4    went to temporary confinement; correct?  She would have

5    made her rounds and come to see you at the, at the bunk

6    that you were at.

7    A.     I don't believe I saw her at a bunk where I was

8    at.

9    Q.     Okay.  Where would you have seen her, if not at

10   the bunk?

11   A.     I believe there's an office down at Building 19

12   that they take you to.

13   Q.     And the reason you would go see a social worker is

14   if you have declared mental health crisis; right?

15   A.     No, I believe -- yes.  Yes, you are right.

16   Correct.

17   Q.     Okay.  So, earlier you said you had declared

18   mental health crisis, and in fact you went and saw the

19   social worker that morning.

20   A.     That was with Lieutenant Mitchell's present, and

21   Lieutenant -- I didn't receive any assistance from the

22   other -- I know there was another lady in the room with

23   Lieutenant Mitchell.

24   Q.     Okay.

25   A.     But I didn't receive any assistance until her

1   being -- her name or anything like that or, you know,

2   recognize it.  You know, because I didn't get a chance to

3   be seen or treated, you know, because Lieutenant Mitchell

4   was interfering and told me if I insist, I was going to

5   segregation.

6              MR. STRATTON:  Your Honor, if I could have

7   permission to approach?

8              THE COURT:  Sure.

9   Q.     (BY MR. STRATTON)  Mr. Coleman, I'm going to show

10  you what we have marked as Defendant's Exhibit No. 9 for

11  identification, have you take a look at that.  And if you

12  could tell me when you are done reading that to yourself.

13  A.     (Pause.)  I'm done.

14  Q.     So, that's your name and number at the top;

15  correct?

16  A.     Yes.

17  Q.     And you see below there, there's a session date

18  and time, and it says -- and that was the day we're

19  talking about; correct?

20  A.     This is a -- this is a report generated by --

21             THE REPORTER:  I'm sorry.  This is a report

22  generated by?

23             THE WITNESS:  Generated by Department of

24  Corrections, yes, Vienna Correctional Center.

25  Q.     (BY MR. STRATTON)  And at the bottom there's a

1    name of the social worker?

2    A.      I see the name, yes.

3    Q.      Right.  And on the right-hand side -- and it says

4    session duration was 15 minutes at 9:00 a.m.; correct?

5    A.      That's false.

6    Q.      I'm sorry?

7    A.      That's false.  I've never had a 15-minute

8    conversation with Tracy Smith.

9    Q.      So, so, Tracy Smith also lied in filling out this

10   form?

11   A.      Yes.

12   Q.      Okay.  Now the -- the description on the left-hand

13   side, is that an accurate description?

14   A.      This is what I told to Lieutenant Mitchell, yes.

15   Q.      Did you tell that to Tracy Smith?  The first

16   paragraph there on the left.

17   A.      In the conversation between Lieutenant Mitchell, I

18   told -- I didn't know she was a social worker.  I know she

19   was in the room, so I told Lieutenant Mitchell I was

20   declaring a crisis.  And I didn't really have a chance to

21   talk to her, so we really didn't have no conversation

22   because Lieutenant Mitchell was telling me that I'm going

23   to segregation if I want to declare a crisis.  So, a

24   conversation with Tracy Smith really didn't happen.

25   Q.      So, let me direct your attention to the paragraph

1    on the right-hand side, if you could read that to

2    yourself.

3            THE COURT:  Do you want this published?

4            MR. STRATTON:  Yes.  I'm sorry, Your Honor.

5    Q.     (BY MR. STRATTON)  So, if I could direct your

6    attention on the right-hand side where it says "plan" and

7    it says "offender reports that he will refuse housing

8    feeling he can cope better in seg."

9            Do you see that?

10   A.     Yes, I see it.

11   Q.     And you said that to Tracy Smith.

12   A.     No, that's absurd.  Any -- anybody in their right

13   mind would not willingly stay in segregation.

14   Q.     So, Tracy Smith lied when she wrote that on this

15   report.

16   A.     That report is false.

17   Q.     And Lieutenant Mitchell was in the room when this

18   was written, too?

19   A.     I don't know if he was in the room when the report

20   was written, so I don't know when the report was written.

21   Q.     I think we're done with that one.  I can take that

22   one back from you.  Thank you.

23           So let's -- let's go to December 31st of 2014.

24   So, this is the day you declared a hunger strike; correct?

25   A.     Around the time, yes.

```
 1    Q.      Okay.  And after you -- we'll go back to the
 2    flooding of the cell.  But after you declared the hunger
 3    strike, you were moved to a crisis cell near the Health
 4    Care Unit; correct?
 5    A.      Yes.
 6    Q.      So, you wanted to be -- you wanted your crisis
 7    addressed; correct?
 8    A.      Yes.
 9    Q.      And they addressed it by moving you to the crisis
10    cell near the Health Care Unit.
11    A.      No.  I was moved to the crisis cell by the Health
12    Care Unit, but my medical issues still were not being
13    treated.
14    Q.      Okay.
15    A.      So, there's a big difference.
16    Q.      Okay.  So let's, let's go ahead to January 3,
17    2015.  So, this was -- you hadn't eaten since December 31,
18    it was about the 72 hours; right?
19    A.      Yes, correct.
20    Q.      And around 8:30 p.m. that night, you, you
21    described this in your testimony -- I don't think you said
22    it was 8:30 p.m. but the nurse's notes reflect that -- you
23    went to Health Care Unit to get your assessment done;
24    correct?
25    A.      Correct.
```

```
1   Q.      Do you remember it being sometime in the evening?
2   A.      Yes, I do.
3   Q.      Okay.  And Nurse Tammy Stevens was on duty;
4   correct?
5   A.      I don't recall her name.
6   Q.      Okay.  And she took your temperature and your
7   blood pressure and your pulse and weighed you and checked
8   your eyes and checked your mouth, all of those things?
9   A.      No, she didn't do all of that.
10  Q.      She didn't do all of that?
11  A.      No.  She took my blood pressure and temperature
12  and that was it.
13  Q.      That was it.  Blood pressure and temperature and
14  nothing else?
15  A.      Nothing else.
16  Q.      Okay.
17  A.      That's the reason I told her I would report her
18  for not following hunger strike protocol.
19  Q.      And -- so she just did those two things and then
20  just stopped?
21  A.      No --
22  Q.      That's when Vinson interrupted?
23  A.      Lieutenant Vinson was, you know, interfering so --
24  Q.      Okay.
25  A.      -- things got kind of, you know, crazy.  And
```

1   Lieutenant Vinson snatched me out of the room.

2   Q.      And she said "I can't finish this" --

3   A.      She didn't say -- I was telling her already that,

4   you know, that -- she got upset because she said *don't*

5   *tell me how to do my job* because I was telling her, you

6   know, hunger strike protocol.

7   Q.      So, in any event, Lieutenant Vinson takes you out

8   of the Health Care Unit and is taking you back to the

9   crisis cell; right?

10  A.      Yes.

11  Q.      And you walk into this kind of large area in the

12  lobby area there, right, to get back to the crisis cell?

13  A.      Correct.

14  Q.      And as he was escorting you back to your cell, you

15  tried to pull away from him, didn't you?

16  A.      False.

17  Q.      So that's, that's also a lie?

18  A.      Yes, that's a blatant lie.

19  Q.      And, and then you just laid down on the floor on

20  your own; correct?

21  A.      False.  I'm a grown man.  It doesn't even make

22  sense for me to just lay on the floor.

23  Q.      Now, eventually he gets you back to your cell;

24  correct?  The crisis cell?

25  A.      Correct.

1   Q.      And there was a short time later when the nurse
2   then comes to your cell to get the urine sample?
3   A.      Correct.
4   Q.      Okay.  And when she comes in the cell, Lieutenant
5   Vinson is in the cell?
6   A.      Yes.  Lieutenant Vinson and Lieutenant Blessing --
7   I mean, Officer Blessing.
8   Q.      And Officer Blessing are in the cell.  And
9   Lieutenant Vinson told the nurse that you had laid down on
10  the floor while he was escorting you back to the cell;
11  correct?
12  A.      No.  I told the nurse that these officers just
13  assaulted me.
14  Q.      Okay.  And you told her, you know, look at this
15  injury on my head, look at the bump on my head; right?
16  A.      Yes.
17  Q.      And she did look at your head; correct?
18  A.      She saw my head but she didn't report it.
19  Q.      So, she, she was part of this coverup as well?
20  A.      I'm saying that she saw the injury, the visible
21  injury, but she didn't report it, so.
22  Q.      She did not report it in her notes?
23  A.      No, she did not.
24  Q.      Well, she also examined your face and your chest
25  and your back for injuries; correct?

1    A.      She couldn't have examined my back because I had a

2    jumpsuit on and handcuffs, so.

3    Q.      Okay.

4    A.      How -- if she can explain how she did that.

5    Q.      Well now --

6    A.      In her report.

7    Q.      So, now you told her about the bump on your head;

8    correct?

9    A.      Yes, and my mouth.

10   Q.      Oh, you told her about the tooth, as well?

11   A.      My mouth was in pain and my -- I had a visible --

12   you know, I didn't tell them my tooth was broken until

13   later, but I knew my mouth was in pain.

14   Q.      So you didn't tell her about the chipped tooth?

15   A.      No.  I told her about the injuries on my wrists,

16   the swelling, the cuts to my wrists, the bump on my head,

17   and my mouth.

18   Q.      Okay.

19   A.      I didn't discover that the tooth was chipped until

20   later.

21   Q.      Okay.  So, you didn't tell her about the tooth?

22   A.      No.  I was just in so much pain, I didn't have --

23   there's no mirror in there so I couldn't do an assessment

24   by checking everything, you know, at that time.

25   Q.      So, when you -- well, we'll get back to the tooth.

```
1              Let me, let me go backwards a little bit, back to

2     December 31.  You were in a segregation cell; correct?

3     A.      Correct.

4     Q.      This -- and this is leading up to when you flooded

5     the cell; correct?

6     A.      Correct.

7     Q.      So, it was a segregation cell that you flooded?

8     A.      Correct.

9     Q.      And now you had earlier testified that they take

10    your property away when you are in segregation; right?

11    A.      Yes.

12    Q.      But you also say that you had property in the

13    segregation cell.

14    A.      Because, because they give you limited property --

15    Q.      Okay.

16    A.      -- after a period of time.

17    Q.      So, you flooded the cell because you needed to

18    declare -- as a way to declare a crisis?

19    A.      Correct.  And to be seen for my medical issues,

20    the pain I was in at the time, right.

21    Q.      And they moved you to a crisis cell after you

22    flooded your cell.

23    A.      No, they did not.

24    Q.      So, after --

25    A.      They did not directly.  They took me to the shower
```

1    and then they took me to an isolated segregation cell

2    upstairs.

3    Q.      And then later that day, they took you to the

4    crisis cell next to the Health Care Unit?

5    A.      Yes.

6    Q.      Okay.  Now, the first thing they did, as you say,

7    was Lieutenant Vinson took you to the shower after you

8    flooded your cell; correct?

9    A.      Correct.

10   Q.      And that was because he needed to get somebody in

11   there to clean up your cell?

12   A.      Correct.

13   Q.      And so you couldn't be in your cell while other

14   people are cleaning it up.

15   A.      Correct.

16   Q.      Now, you can't see into your cell from the shower;

17   correct?

18   A.      Correct.

19   Q.      So, you didn't see Lieutenant Vinson dump your

20   property into the water on the floor?

21   A.      That's correct.

22   Q.      And he didn't tell you that he dumped your

23   property into the water?

24   A.      No.  The workers that were cleaning up the cell

25   told me they saw Lieutenant Vinson dump the property.

1    Q.      Okay.  And the workers' names, you have those

2    names, I'm sure?

3    A.      No.  I requested them from the department.  They

4    refused to disclose them.

5    Q.      So, who refused to disclose them?

6    A.      I requested them through discovery.

7    Q.      Okay.  And so they're part of the coverup, too?

8    A.      I'm not sure.

9    Q.      Well, you didn't get the names?

10   A.      Of course.  That's the point.

11   Q.      So they, they must be part of the coverup.

12   A.      If I had the names, then I would be able to tell

13   you the names.

14   Q.      Okay.  So let's -- you had earlier testified about

15   segregation.  The nurses make daily rounds in segregation,

16   don't they?

17   A.      Sometimes.

18   Q.      Sometimes they don't go at all?  No nurse for a

19   whole day in segregation?

20   A.      To deliver medication, but they don't come to --

21   you know, for any issues.  If you don't submit a medical

22   request slip, you won't be seen.  They can come and stand

23   right in front of your cell and you can tell them

24   everything that's wrong with you.  But if you don't submit

25   a medical request slip, you will not be seen because --

1    the reason for that is, you have to pay five dollars for

2    every trip to the doctor for sick call.  So, if you don't

3    fill out that form, you will not receive medical

4    treatment.

5    Q.      And, and you were allowed to fill out that form?

6    A.      I filled numerous forms out and still wasn't seen.

7    Q.      So, they ignored every one of your requests for

8    medical treatment?

9    A.      No.  I was taken over there but I was never

10   treated, you know.  I was never properly treated.  They

11   would tell me, exercise, drink more water, give me -- I

12   received Ibuprofen, and it did nothing.  Nothing for me at

13   all.

14   Q.      Now, when you are in segregation you also can see

15   the social worker; correct?

16   A.      Correct.

17   Q.      And you can see your counselor; correct?

18   A.      Correct.

19   Q.      And you can see members of the crisis team?

20   A.      Correct.  If they choose to come around.

21   Q.      Okay.  Now, we have talked about -- we have talked

22   about -- well, let me ask this:  So, on -- you testified

23   that on January 4, you talked to the Warden about what had

24   happened to you the day before; correct?

25   A.      It was around that time, correct.  Yes.

1    Q.      Around that time.  Now, was this the Warden or the

2    Assistant Warden?

3    A.      Assistant Warden.

4    Q.      And this is Assistant Warden Love?

5    A.      Love, I believe, yes.

6    Q.      And you told Assistant Warden Love that you wanted

7    a transfer?

8    A.      No, I told the Head Warden Lieutenant Hilliard.

9    Q.      And was that on January the 4th?

10   A.      I -- if the day -- it was either the day that --

11   the 5th or -- whenever Warden Hilliard came to visit me.

12   Q.      Okay.  So, you told Warden Hilliard that you

13   wanted a transfer?

14   A.      Yes.  I told Warden Hilliard that I feared for my

15   life and that I wanted -- I needed to transfer up out of

16   there.

17   Q.      And he gave you a transfer?

18   A.      Yes, he did.

19   Q.      And it was to a maximum security facility?

20   A.      Yes, he did.

21   Q.      So, did you request -- you didn't request a

22   transfer from the Assistant Warden, did you?

23   A.      No, I did not.  He didn't have the authority to

24   give me a transfer.

25   Q.      Now, the tooth that you got treated, you said that

1    was cosmetic surgery; correct?

2    A.      It was -- the Department of Corrections deems it

3    cosmetic surgery.

4    Q.      Cosmetic dental treatment?

5    A.      Yes.

6    Q.      And -- so let me ask you -- so you were, you were

7    at Vienna about -- you got there about November 6, 2014;

8    correct?

9    A.      Correct.

10   Q.      And you were transferred to Pontiac around January

11   14 of 2015, around that time?

12   A.      Around that time, yes.

13   Q.      And during that time you had this incident on

14   November 17; right?

15   A.      Correct.

16   Q.      And you had the incident flooding the cell on

17   December 31; correct?

18   A.      Correct.

19   Q.      And that's when you declared the hunger strike.

20   And then three days later is the incident with Lieutenant

21   Vinson coming back from the Health Care Unit; right?

22   A.      Around that time, uh-huh.

23   Q.      So, in that roughly two months, a little more than

24   two months, you had those three incidents there at Vienna?

25   A.      Yes.

Q.      Okay.  And we have talked a little bit, you
testified about the lies and the coverup.  I want to make
sure I have covered everybody.  So, Lieutenant Vinson is
in on this coverup; correct?

A.      I just explained what these individuals did.  You
term it, you know, what you term it.  But I just explained
truthfully and honestly what these individuals did to me.

Q.      Okay.  But the nurse was lying in her reports;
correct?  That's what you're saying?

A.      Yes.  The nurse, she falsified a report, yes.

Q.      And, and the social worker falsified her report?

A.      Yes.  I never spoke to a social worker about
staying in segregation or anything of that nature.

Q.      And, and Officer Dent falsified the disciplinary
ticket?

A.      You have to understand, these are coworkers who
have been working together for years, so.

Q.      And Lieutenant Mitchell signed that disciplinary
ticket, so he must have lied, too?

A.      Lieutenant Mitchell was the one that orchestrated
the segregation so, of course.

Q.      Okay.  And Lieutenant Mitchell's supervisor signed
that ticket, so he must have lied, too?

A.      I'm not sure what his supervisor did.

Q.      Well, he must have been in on the coverup because

1    he signed proving what Lieutenant Mitchell did?

2    A.      No.  When a supervisor sign a disciplinary ticket,

3    he just sign off on it.  He don't have privy to what

4    actually happened, he just sign off on Lieutenant

5    Mitchell's decisions.  So, he don't necessarily know what

6    was involved, so he just sign off on Lieutenant Mitchell's

7    decision.  So, I cannot say he was involved in the coverup

8    at all.

9    Q.      Well, what about the adjustment committee?

10   They're the ones who found you guilty of that ticket.

11   They must have been involved in this.

12   A.      As far as adjustment committee, no.  It goes -- as

13   far as credibility, they either believe an officer or an

14   inmate, so they chose to believe an officer.

15   Q.      And the Assistant Warden?

16   A.      What about the Assistant Warden?

17   Q.      The Assistant Warden was in on it, too?

18   A.      I don't know anything about the Assistant Warden.

19   Q.      Well, you talked to the Assistant Warden?

20   A.      Yes.  I don't know anything about any decisions he

21   made.

22           MR. STRATTON:  Can I have one moment, Your Honor?

23           THE COURT:  Sure.

24           (Pause.)

25           MR. STRATTON:  I have no further questions, Your

1    Honor.

2           MS. PHILLIPS:  Just a few more questions, Your

3    Honor.

4           THE COURT:  In like 10 minutes, kind of questions?

5           MS. PHILLIPS:  Yes.

6           THE COURT:  Okay.

7                         REDIRECT EXAMINATION

8    BY MS. PHILLIPS:

9    Q.      Dwaine, during that November 17, 2014, incident,

10   Officer Dent didn't walk you to segregation, did he?

11   A.      No, he did not.

12   Q.      And Officer Cabot didn't walk you to segregation,

13   did he?

14   A.      No, he did not.

15   Q.      So, it was only after Lieutenant Mitchell came to

16   the situation, were you walked to segregation?

17   A.      Correct.

18   Q.      That was after you complained of the treatment you

19   were receiving, that you were walked to segregation?

20   A.      Correct.

21   Q.      Okay.  And did you plead not guilty to that

22   disciplinary ticket?

23   A.      I did.

24   Q.      And you testified a bit about your interaction

25   with a nurse on January 3rd, 2015.  Did the nurse take

1    your shirt off to examine your back or your chest --
2    A.      No, she did not.
3    Q.      -- at all?  Okay.  And lastly, you eventually did
4    receive medical treatment, didn't you?
5    A.      Yes, I did.
6    Q.      Okay.  Was it at Vienna?
7    A.      No, it wasn't at Vienna.
8    Q.      Where did you receive medical treatment?
9    A.      I was sent to Pontiac.  When I was sent to
10   Pontiac, they treated me for my back issues.  They gave me
11   medication to treat my back issues.  They gave me an
12   ultrasound of my testicle to diagnose the issue with my
13   testicle, which they found to be epidermitis.  So, I was
14   eventually treated at the next institution.
15   Q.      Just not at Vienna?
16   A.      No, not at all at Vienna.
17           MS. PHILLIPS:  No further questions.
18           MR. STRATTON:  Nothing further, Your Honor.
19           THE COURT:  Okay.  Mr. Coleman, that concludes
20   your testimony.  You may step down, sir.
21           (Conclusion of the testimony of Dwaine Coleman-.)
22
23
24
25

1          <u>REPORTER'S CERTIFICATE</u>

2              I, Christine Dohack LaBuwi, RDR, RMR, Official

3     Court Reporter for the U.S. District Court, Southern

4     District of Illinois, do hereby certify that I reported

5     with mechanical stenography the proceedings contained in

6     pages 1-57; and that the same is a full, true, correct and

7     complete transcript from the record of proceedings in the

8     above-entitled matter.

9

10             DATED this 18th day of October, 2018,

11

12                        s/*Christine Dohack LaBuwi, RDR, RMR*

13                        Christine Dohack LaBuwi, RDR, RMR

14

15

16

17

18

19

20

21

22

23

24

25