```
 1                      UNITED STATES OF AMERICA
                      SOUTHERN DISTRICT OF ILLINOIS
 2

 3    DWAINE COLEMAN,                    )
                                        )
 4                    Plaintiff,        )
      v.                                ) No. 3:15-cv-898-RJD
 5                                      )
      JAMES VINSON, et al.,             ) Benton, IL
 6                                      )
                      Defendants.       )
 7

 8

 9
                   TRANSCRIPT OF JURY TRIAL PROCEEDINGS
10
                          TRIAL TESTIMONY OF
11                           JAMES VINSON

12             BEFORE THE HONORABLE REONA J. DALY
                 UNITED STATES MAGISTRATE JUDGE
13
                          October 2, 2018
14

15

16

17

18

19

20

21    REPORTED BY:        Christine Dohack LaBuwi, RDR, RMR
                          Official Court Reporter
22                        301 West Main Street
                          Benton, Illinois  62812
23                        (618) 439-7725
                          Christine_Dohack@ilsd.uscourts.gov
24
      Proceedings recorded by mechanical stenography, produced
25    by computer-aided transcription.
```

```
 1    APPEARANCES:

 2    FOR PLAINTIFF:        Michael J. Hickey, Esq.
                            Jerina D. Phillips, Esq.
 3                          LEWIS, RICE LLC
                            600 Washington Ave., Suite 2500
 4                          St. Louis, MO  63101
                            (314) 444-7600
 5                          mhickey@lewisrice.com
                            jphillips@lewisrice.com
 6

 7    FOR DEFENDANTS:       Ann M. Spillane, Esq.
                            Brent D. Stratton, Esq.
 8                          OFFICE OF THE ATTORNEY GENERAL
                            100 W. Randolph St., 12th Floor
 9                          Chicago, IL  60601
                            (312) 814-3000
10                          aspillane@atg.state.il.us
                            bstratton@atg.state.il.us
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                           I N D E X

 2                           WITNESSES

 3    ALL WITNESSES:                            PAGE:

 4       JAMES VINSON for Defendant:
            Direct Examination by Ms. Spillane      4:16
 5          Cross-Examination by Mr. Hickey         24:22

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Proceedings were held in open court, parties and
 2    jury present.)
 3              MS. SPILLANE:  At this time, the defendants would
 4    call Lieutenant James Vinson.
 5              THE COURT:  Please step up here, sir, and raise
 6    your hand to be sworn.
 7              (Witness sworn by clerk.)
 8              THE WITNESS:  James Vinson,
 9              THE COURT:  Spell your last name.
10              THE WITNESS:  V-I-N-S-O-N.
11              THE COURT:  You may proceed.
12                             JAMES VINSON,
13    having been first duly sworn, was examined and testifies
14    as follows:
15                         DIRECT EXAMINATION
16    BY MS. SPILLANE:
17    Q.       Mr. Vinson, what's your current occupation?
18    A.       I'm retired.
19    Q.       When did you retire from the Department of
20    Corrections?
21    A.       I retired June 29th of this year.
22    Q.       And how long had you worked at the Department of
23    Corrections?
24    A.       Roughly 27 years.
25    Q.       Can you walk us through the positions you held
```

1    during the years that you worked at the Department of

2    Corrections?

3    A.      Yeah.  I hired in at Menard Correctional Center in

4    1991; I stayed there until around March of '97.

5    Transferred to Shawnee Correctional Center; I was there

6    from March '97 until about August of '99.  I transferred

7    to Vienna.  I was at Vienna August '99.  I made Lieutenant

8    in, around October -- or, I'm sorry -- I made Sergeant

9    around October 2010, and I became Lieutenant in December

10   of 2011.

11   Q.      Why did you become a correctional officer?

12   A.      I kind of followed my dad's footsteps, basically.

13   Q.      In December -- well, you have heard that these

14   events that we're talking about were in November 2014,

15   December 2014, and January 2015.  What was your -- what

16   were your job duties in that period at Vienna?

17   A.      I was a Zone Lieutenant, but I worked kind of all

18   over the institution.  So, I would kind of -- day by day,

19   I'd have a different zone.  I never knew what it was going

20   to be.

21   Q.      What does a Zone Lieutenant do?

22   A.      A Zone Lieutenant is just a supervisor of a

23   certain -- Vienna is divided up into basically four zones:

24   1, 2, 3 and 4, with 4 being outside the fence.  And I

25   never knew from day to day which one I was going to have.

1    Q.      Were you a member -- we have heard Lieutenant

2    Mitchell talk about how lieutenants at Vienna were members

3    of the Crisis Team.  Were you a member of the Crisis Team?

4    A.      Yes.

5    Q.      And as a member of the Crisis Team did you receive

6    training?

7    A.      Yes.

8    Q.      What kind of training?

9    A.      It was training given by the mental health

10   professionals.  I can't remember, it's like an hour,

11   two-hour course, and we did it once a year.

12   Q.      Obviously, you have seen -- you have had an

13   opportunity to see the plaintiff, Mr. Coleman.

14   A.      Yes.

15   Q.      Do you remember Mr. Coleman?

16   A.      I vaguely remember Mr. Coleman, yes.

17   Q.      Okay.  I'm going to walk you through -- Mr.

18   Coleman, when he testified, made a number of statements

19   about interactions with you.

20   A.      Mm-hmm.

21   Q.      And so I'm going to try to do that as best I can

22   in chronological order.

23           Mr. Coleman testified that in November 2014, I

24   believe after the incident with -- that involves

25   Lieutenant Mitchell, you were walking through segregation

1    and you talked to him and you -- in response to something

2    he said, you told him that *correctional officers can do*

3    *whatever they want*.   Do you remember hearing that?

4    A.      No, I don't remember that at all.

5    Q.      But you remember hearing him testify to that

6    this --

7    A.      I remember hearing him testify to that, yes.

8    Q.      If you don't remember that incident, let me just

9    ask you:  Do you think you did that?

10   A.      No.  I wouldn't have done that, no.  I mean, I

11   don't -- I wouldn't have known what was going on.  But if

12   an inmate wants to stop me and they have a problem, I will

13   listen to him and I will check into it, if I can.

14   Q.      And some of that relates to your job as a Crisis

15   Team member; right?

16   A.      As a Crisis Team member and as a supervisor, yes.

17   Q.      Now, you heard Mr. Coleman testify this morning

18   about the incident where he flooded his cell.

19   A.      Yes.

20   Q.      Do you remember a day where Mr. Coleman -- where

21   you were at work and Mr. Coleman flooded his cell?

22   A.      I remember being involved with several cell

23   floodings, but I can't say I remember his in particular.

24   Q.      Okay.  So, did you -- when an inmate would flood

25   their cell, was there generally a procedure you would

1   follow?

2   A.      Yes.  I would remove him from the cell.  If we had

3   a cell open, I would put him in a different cell.  If not,

4   I would have taken him to the shower, where he could --

5   you know, I have to get him out, I would have to move him

6   somewhere, so, yes, he was probably placed in a cell or in

7   a shower.

8   Q.      And you have to get him out of the way, why?

9   A.      Well, I mean, we can't get it cleaned up with the

10  guy in the room, with water everywhere.  We have to move

11  him somewhere.

12  Q.      Okay.  What's your role -- who cleans the cell and

13  what's your role as this is going on?

14  A.      Well, my role would have been, I'm sure the

15  officer would have contacted me.  I would show up in seg

16  because I have to remove him from the cell.  The officer

17  cannot remove him from the cell without me being -- I'm

18  the supervisor.  I need to be there to remove him.  I

19  would have removed him, put him in the shower, and

20  probably just observed the inmates that were cleaning up

21  the cell.

22  Q.      There are inmates who help with things like that?

23  A.      We -- yes.  They're called porters, and we have

24  seg porters.  They clean up.  They clean the showers.

25  They mop the floors.  They help pass out trays.  They do a

1    lot of things.

2    Q.      When this is going on -- and you said you had

3    several incidents of flooding -- and so in your normal

4    workings, would you go into the cell as it's being

5    cleaned?

6    A.      Normally, I would not.  I can't say I never have

7    because maybe I did.  But normally, I wouldn't want to

8    walk through the water.  I would stand outside.

9    Q.      And Mr. Coleman testified about his allegations of

10   something you did, that you dumped his -- that you went

11   into the cell and you dumped his property into the water.

12   You heard that this morning?

13   A.      Yes, I heard that.

14   Q.      If Mr. Coleman was in the shower, if that's where

15   you had to put him because there were no cells available,

16   what would he have been able to see from, from the shower?

17   A.      He would have been able to see the hallway.

18   Q.      Could he see his -- into his cell as it was being

19   cleaned?

20   A.      He would not be able to see into his cell, no.

21   Q.      Do you have any recollection of going into his

22   cell and dumping his property?

23   A.      No.  But I have never dumped anyone's property in

24   the water, ever.

25   Q.      After that incident, Mr. Coleman testified that

1    you -- you took him upstairs.  You cleared out segregation

2    to put him in an isolated cell.  I don't -- let me ask:

3    Do you recall doing that?

4    A.      No.  But that couldn't have happened.  I don't

5    have the authorization to clear out seg and put him

6    anywhere.  That is made by somebody above me.  Back then,

7    we had a upstairs seg -- segregation.  But I -- the shift

8    commander would have had to make the call to place

9    somebody up there to work, because we can't put an inmate

10   up there without a staff member working up there.  And

11   there wasn't always someone up there.

12   Q.      And so what you're saying is, if it was empty, a

13   shift commander would have to give you the authorization

14   to put him there?

15   A.      They would have to tell me, *put him up there*.  I

16   would not be able to make that call on my own.

17   Q.      If there were inmates in those cells, do you have

18   the authority to clear the cells out?

19   A.      No.  I have to get permission to do all that.

20   Q.      Mr. Coleman also talked about being in an isolated

21   seg cell.  Is there -- is there such a thing?

22   A.      There are no isolated seg cells, no.  We do have

23   crisis cells, but they're in a different location.  There

24   are no isolated seg cell.

25   Q.      Mr. Coleman talked about an incident where he told

1    you that he was suicidal, and you ignored him.  Do you

2    remember that?

3    A.     I do not remember him ever talking to me about

4    being suicidal.  Had he -- had anyone ever talked to me

5    about that, there would be paperwork on it.  There would

6    be an incident report.

7    Q.     When you are trained on the Crisis Team, is there

8    -- do you get training on what to do if someone tells you

9    they're suicidal?

10   A.     Yes, I do.

11   Q.     And what are you told to do?

12   A.     Well, since I'm not a mental health professional,

13   I would, I would take him to the mental health

14   professional right away.

15   Q.     He -- I believe that Mr. Coleman next said that

16   you took him to a nurse -- after that, you took him to the

17   nurse and you tried to hit him while he was with the

18   nurse.  Do you remember that?

19   A.     No, absolutely not.

20   Q.     Do you -- from your time at Vienna, do you ever

21   remember an incident where you tried to assault an inmate

22   while they were seeing the nurse?

23   A.     I was there 27 years.  I never assaulted or even

24   thought about assaulting anyone, ever.

25   Q.     If you, if you were to do something like that,

1    would you expect the nurse would, would make note of that?

2    A.      If anyone did something like that, other staff

3    members would definitely make a note of it.  I mean,

4    that's not something that people are just going to let

5    happen.

6    Q.      Now, before we get to talking about the incidents

7    on January 3rd, 2015, let me -- we have heard and we have

8    had some testimony about the Health Care Unit and the

9    crisis cells.  But if you could just describe, at Vienna,

10   where the Health Care Unit is and, and in relation to

11   that, where the crisis cells are.

12   A.      The healthcare is in Building 19.  It -- there's a

13   big lobby area they call the center core area.  It's like

14   a big waiting area.  A big giant waiting area.  When you

15   come -- if you are leaving the Health Care Unit, you come

16   out the door, there will be a hallway to your right.  Past

17   the hallway, there's another door about six or eight feet,

18   and it leads into a room that has two cells, the crisis

19   cells.  It's very close, a matter of 15 feet probably.

20   Q.      What is -- what are the crisis cells?  What's the

21   purpose of the crisis cells?

22   A.      The crisis cells' sole purpose is for people

23   having a mental health crisis.  Most of the time, it's

24   somebody that says they want to hurt theirselves, or even

25   a hunger striker might go in there because they have to

1    separate those guys to make sure, when they eat and when

2    they don't eat, it has to be documented.

3    Q.      When someone is in a crisis cell, are they

4    observed more often than they would be in, in either a

5    segregation cell or a regular bunk?

6    A.      Yes.  Well --

7    Q.      A dorm room?

8    A.      -- it depends on the mental health professional.

9    They decide how often.  It could be ten minutes, it could

10   be 15 minutes, it could be 30 minutes.  All inmates at

11   Vienna are monitored every 30 minutes, no matter where

12   they are at.  But if it's 10 or 15 minutes, yeah, then

13   there would be a log that they write every 10 minutes,

14   every 15.  Whatever it is they direct us to do.

15   Q.      If an inmate is in a crisis cell and they need to

16   go from the crisis cell to the Health Care Unit, how does

17   that happen?

18   A.      Well, if they're in segregation status, they would

19   be handcuffed and, and led.  If they're not segregation

20   status, they would just -- I would probably still escort

21   them just to -- you know, because they are being monitored

22   and observed.

23   Q.      And that's something you would do as the Zone

24   Lieutenant?

25   A.      As a Zone Lieutenant, yes, that's something I

1    would do.  Or if I had a Sergeant up there, he could do

2    it, too.

3    Q.      And the same thing is true when they need to go

4    back from the Health Care Unit to the crisis --

5    A.      Yes.  I'll escort them back, also.

6    Q.      When you, when you enter the Health Care Unit at

7    Vienna, how is that set up?  Is there a desk?  Is there --

8    A.      When you first enter the Health Care Unit, there's

9    a desk directly to your right that the officer would be

10   sitting at.  And that's -- he does all the paperwork,

11   watches the inmates.

12          If you go down just a few feet, there's a window

13   that they get their pills from.  And then they got an

14   office to the left, just, I don't know, 12, 15 feet inside

15   the door.  That's usually where the nurse does all their

16   -- whatever they gotta do, you know, in any nursing visit.

17   Q.      Okay.  The officer who's at the desk, what's -- to

18   your knowledge, as a supervisor, what's that officer's

19   focus?

20   A.      That officer's job is to secure that door.  He

21   watches that door.  Only people that are supposed to be in

22   or out, go in or out.  And he doesn't leave that post.

23   And he signs them in and out.  He signs their passes.

24   Q.      Okay.  Do you remember escorting Mr. Coleman from

25   the crisis cell to the Health Care Unit on Saturday,

1    January 3rd, 2015?

2    A.      I really don't remember going from the crisis cell

3    to the Health Care.  I do remember coming back.

4    Q.      Okay.  So, let's start with when you, when you got

5    to the Health Care Unit.  Do you remember what happened

6    inside the Health Care Unit?

7    A.      I don't really remember anything happening inside

8    the Health Care Unit.

9    Q.      So, Mr. Coleman testified that you disrupted the

10   ability of the nurse to do the 72-hour assessment.

11   A.      When I go with any inmate into the Health Care

12   Unit, I am security.  I am there to make sure everything

13   -- that no one does anything they're not supposed to do.

14   Anytime that a segregation inmate goes anywhere, a

15   Lieutenant or -- a Sergeant or above has to be there.  I

16   don't say anything when they're talking to the nurses.

17   That's the nurse's job, not mine.  I do not get involved

18   in the healthcare part of it at all.

19   Q.      And in 27 years as a correctional officer, do you

20   recall a time where you interfered and where you

21   disturbed, got in the way, of an inmate's ability to talk

22   to a nurse?

23   A.      No.  I, I stay out of their mental issues -- their

24   health issues, they're mental health issues.  I stand to

25   the side.  I stay out of it.  I let the mental health

1   professional or nurse do their thing.  I don't get

2   involved in that.

3   Q.      Mr. Coleman described that he was going from the

4   crisis cell to the Health Care Unit for something called

5   the 72-hour assessment for a hunger strike.  Do you know

6   what that is?

7   A.      Yes.

8   Q.      He also indicated in his testimony that he made

9   the allegation that correctional officers don't like to

10  record when someone begins a hunger strike because you

11  have to notify Springfield.  Does that sound familiar to

12  you?

13  A.      You have to notify people, but it's not really a

14  big deal.  You just -- I would pick up a phone and call my

15  shift commander.  I would call the Health Care Unit.  And

16  I might do a short incident report saying, *On the above*

17  *date and approximate time Inmate Coleman declared a hunger*

18  *strike*.  It's a very simple thing to do.  It's not, not

19  hard -- there's no reason to avoid it.

20  Q.      During the years that you worked at Vienna, how

21  often did inmates declare a hunger strike?

22  A.      Oh, I don't know.  If they ever did, probably

23  about once every two or three months, you might have one

24  do it.

25  Q.      So, dozens and dozens of times while you were

1    there --

2    A.      Over the years?  Probably dozens of times, yes.

3    Q.      Do you remember, you indicated that you do kind of

4    remember taking Mr. Coleman from the Health Care Unit back

5    to the crisis cell.

6    A.      Yes.

7    Q.      Why do you remember that?  What happened?

8    A.      I remember that because he was upset about

9    something and he pulled away from me.  And I've had

10   inmates pull away from me before, but usually because they

11   want to run and talk to somebody else or whatever.  But he

12   laid down in the middle of the floor, right in the middle

13   of the, the waiting area out there, that center core.  And

14   I've never had a guy do that before.  It was very unusual.

15   I don't know why he decided to lay down on the floor and

16   refuse to go in his cell, but that's what happened.

17   Q.      Would you have anybody with you escorting -- did

18   you have anybody with you?

19   A.      I do not remember if I had anybody with me.  If I

20   know that an inmate has issues or he's not happy or

21   whatever, I usually would have somebody with me, such as a

22   Sergeant.  But I don't remember if he was there or if he

23   wasn't there, you know.

24   Q.      Would you have written a report about this

25   incident?

1    A.      Yes, I would have.

2    Q.      I would like to show you what has been marked as

3    Defendant's Exhibit 3.  Do you recognize that document?

4    A.      What's that?

5    Q.      Do you recognize that document?

6    A.      Yes, I do.

7    Q.      Can you tell us, without going through the

8    details, just generally what is that?  What is this form?

9    A.      It's a incident report, a DC-434.  You just write

10   at any time an unusual incident occurs.

11   Q.      And is that your handwriting?

12   A.      Yes, it is.

13   Q.      And your signature on the document?

14   A.      Yes.

15   Q.      Does this help to refresh your recollection of

16   this incident, improve your recollection, as well as who

17   was with you?

18   A.      Well, it basically says what I remember.  He laid

19   down on the floor.

20   Q.      I'm going to stop you there for one second.

21           MS. SPILLANE:  I'd move to admit Defendant's

22   Exhibit 3 and ask permission to publish this.

23           THE COURT:  Any objection?

24           MR. HICKEY:  No.

25           THE COURT:  It will be admitted and you may

1  publish it.

2          MS. SPILLANE:  Thank you.

3  Q.      (BY MS. SPILLANE)  So, before we -- before I ask

4  you to give a little bit of detail, the jury can now see

5  the document.  So, I'm going to have you just tell us a

6  bit what some of these things are.  So, at the top you see

7  the date of the incident and the time.  Can you tell us

8  what that says?

9  A.      The date of incident is 1/3/15.  And it says,

10 "Time:  8:50 p.m."

11 Q.      And then why don't you walk us through what these

12 -- what the next two things are.  You can skip the

13 assorted boxes -- well, actually, you shouldn't.  Why

14 don't you tell us what those boxes mean and walk us

15 through this.

16 A.      Well, they're just all questions.  And it asks:

17          "Was a weapons involved?  No.

18          "Property damage?  No.

19          "Arrest made?"  --

20          THE REPORTER:  Okay, you're going to have to slow

21 down just a little bit.

22          THE WITNESS:  I'm sorry.

23 A.      "Weapons involved?  No.

24          "Property damaged?  No.

25          "Arrest made?  No.

1        "Media inquiries?  No.

2        "Were restraints used?  Yes."

3   Q.      (BY MS. SPILLANE)  And what does, what does that

4   mean?

5   A.      Were handcuffs.

6   Q.      And you indicated earlier that if he was in

7   segregation status, he would have been wearing handcuffs?

8   A.      He would have been wearing handcuffs, yes.

9   Q.      Is that what that reflects?

10  A.      That's what that reflects, yes.

11  Q.      You can go ahead.

12  A.      The next one is:

13          "Chemical agents?  No.

14          "Law enforcement notified?  No.

15          "Any injuries or hospitalizations?  No."

16  Q.      And the question of any injuries.  If Mr. Coleman

17  was injured as a result of falling on the ground, if he

18  said he was injured or you thought he was injured, would

19  you have to mark it there?

20  A.      I would have to mark it "yes."

21  Q.      Okay.  The next part of the form indicates that

22  Mr. Coleman was the offender involved.  And then explain

23  what comes after that.

24  A.      After inmate -- or after offender's involved, it

25  says "witnesses to incident."

1    Q.      Okay.  And I'm going to attempt to zoom this.  I'm

2    sure that I'm going to fail.

3            (Off the record.)

4    Q.      (BY MS. SPILLANE)  Okay.  So, it says "witnesses

5    to incident," and can you tell us what it says there?

6    A.      It says:  Sergeant Vick, and it gives a Badge No.

7    11909; C/O Anderson, Badge No. 13626.

8    Q.      And that's Correctional Officer Anderson?

9    A.      Correctional Officer, yes.

10   Q.      All right.  The fact that you wrote their names

11   there, what does that mean?

12   A.      That means they were present.

13   Q.      Would you -- if somebody else was present, would

14   you leave them off of this for any reason?

15   A.      No, I would -- I would put everybody that was

16   there down.  I mean, it says witnesses.  I would have put

17   anybody in the room to be down on there.

18   Q.      Okay.  You have heard Mr. Coleman testify to his

19   allegation that Correctional Officer Blessing was with you

20   during this.

21   A.      I heard him say that, yes.

22   Q.      Do you see -- did you put Officer Blessing's name

23   anywhere on this form?

24   A.      No.

25   Q.      Okay.  Now, the next section then is the

1    narrative.

2    A.      Mm-hmm.

3    Q.      Can you -- I'm going to -- give me one second to

4    make this readable for the jury.

5    A.      Yeah, my handwriting is kind of sloppy there.

6    Q.      If you could you read that to us.

7    A.      "On the above date and approximate time while

8    being escorted from the Health Care Unit -- or HCU -- back

9    to his cell, Inmate Coleman tried to pull away from this

10   Lieutenant and then laid down on the floor.  Inmate

11   Coleman was then seen by the nurse a second time and was

12   then placed back in his cell.  Inmate Coleman had no

13   visible injuries."

14   Q.      If Inmate Coleman was telling you that he was

15   injured, would you have recorded that on that form?

16   A.      Yes.  And I would have taken him back to the

17   nurse.  Which, obviously I did, because it says he was

18   taken to the nurse a second time.

19   Q.      Okay.  I'll take that one back from you.

20           Do you recall what happened -- so, this was at

21   about 8:50 p.m.  Do you recall what happened next that

22   evening, between where you were engaged with Mr. Coleman?

23   A.      I -- the only thing else I can tell you about it

24   is, later on that night at some point, I do not know which

25   -- what time, we had to get a urine specimen from him.

Q.      And why would the nurse need a urine specimen from
him, if you know?

A.      It was part of his assessment for the hunger
strike.

Q.      Okay.  Can you explain what you remember about,
about that, getting -- the process of getting the urine
sample?

A.      Well, I know that we had to go in the cell.  And I
know the nurse -- I remember the nurse being with me in
the cell.  We had to go in there.  He had to urinate in a
cup.  I don't remember anything out of the ordinary.  I
mean, he, he wasn't happy, obviously, but we got the urine
sample and left with no, no other incident.

Q.      You heard Mr. Coleman testify that while the nurse
was trying to get the urine sample from him, he was
talking to her and you physically held his mouth shut.  Do
you remember that?

A.      I remember him saying that, yes.

Q.      Do you remember that happening?

A.      No.  I've never held anybody's mouth shut so they
couldn't talk, no.

Q.      He also testified that Correctional Officer
Blessing was with you, and that Correctional Officer --
while you were physically holding his mouth shut, C/O
Blessing was choking him.  Do you remember that?

1    A.      No.  I don't remember C/O Blessing even being

2    there.

3    Q.      Okay.  The plaintiff -- Mr. Coleman then said that

4    after that incident he was moved to a cage.  Do you

5    remember taking him back to the crisis cell?

6    A.      The only place I would have put him back is, is

7    back where he came from, the crisis cell.  I can't take

8    him out of that cell.  Only Mental Health can release him

9    from that cell.

10   Q.      Okay.  You have heard all the testimony today from

11   Mr. Coleman, essentially about a lot of interactions with

12   you, where you were trying to do him harm.  Do you have

13   any recollection of, of having any anger or frustration

14   with Mr. Coleman?

15   A.      No.  None.  I don't -- I just know what I have and

16   haven't done, and I have never choked anybody.  I have

17   never tried to hit an inmate.  I have never done any of

18   that, ever.  I mean, I've been there 27 years.  Never.

19   Q.      Thank you Mr. Vinson.

20           MS. SPILLANE:  I have no further questions.

21                       CROSS-EXAMINATION

22   BY MR. HICKEY:

23   Q.      Lieutenant Vinson, I'm Michael Hickey.  I'm

24   counsel for Mr. Coleman.  I'm going to tell you the same

25   stuff that I told the other witnesses, which I may be, you

1    know, treading some old territory but I appreciate it.

2          On this incident report, you indicate that Inmate

3    Coleman tried to pull away from this Lieutenant and then

4    laid down on the floor.  Do you see that?

5    A.    Yes, I do.

6    Q.    Then indicate that he was seen by a second nurse,

7    placed back in his cell.  You note that Inmate Coleman had

8    no visible injuries.  Why would you note that he had no

9    visible injuries, if all he did was just lay down on the

10   floor?

11   A.    Because obviously he had complained about some

12   type of injury or I wouldn't have taken him back to the

13   nurse a second time.

14   Q.    You don't note that complaint on this report

15   though, do you?

16   A.    No, it's not on there.

17   Q.    Okay.  Do you recall him making complaints about

18   injuries?

19   A.    I don't remember any specific complaint, no.

20   Q.    Okay.  Do you have any idea how Mr. Coleman got a

21   chipped tooth?

22   A.    Absolutely no idea how he got a chipped tooth.

23   Today is the first day I have heard about that.

24   Q.    You don't remember him ever saying that he was

25   suicidal?

1    A.      No.

2    Q.      You don't remember him ever declaring a crisis?

3    A.      He never declared a crisis to me, no.

4    Q.      Well, that you recall; is that right?

5    A.      Well, if he declared a crisis to me, there would

6    be another incident report on that.

7    Q.      So, every single time an inmate has declared a

8    crisis, you have always done an incident report?

9    A.      Without exception, I have always done one, yes.

10   Q.      Do you remember Mr. Coleman saying anything to the

11   nurse during the, you know, either of these two sessions?

12   A.      I don't know.  I'm sure he talked to the nurse,

13   but I wouldn't know what -- no, I can't recall what was

14   said, no.

15   Q.      Do you recall the nurse saying something to the

16   effect that she was more of a man than him, and him

17   responding that, yeah, yeah, you are, or --

18   A.      I don't remember the nurse saying anything to him

19   either.

20   Q.      Okay.  And when, when Inmate Coleman was seen by

21   the nurse, you know, either the first or second time, do

22   you remember him being stripped down so that she could,

23   you know, determine if he had any injuries on his body?

24   A.      I can't say that I remember that.  The only thing

25   I can tell you about that is, if he was in the crisis

1    cell, if he was on a 10-minute or a 15-minute watch, he

2    most likely didn't have anything on but a smock.   He

3    wouldn't have had a jumpsuit on or a T shirt or anything

4    like that.

5    Q.      And is that smock something that you have to,

6    you'd have to remove or pull down in order to look at the

7    chest; is that right?

8    A.      Actually, it's like -- it's got a couple straps

9    and it just slides over them.  It kind of covers the front

10   and back, but it's very easy to look between -- I mean,

11   you could pull it and see his back; you could pull it and

12   see his front.  I mean, you could see anywhere you need to

13   see.

14   Q.      But you'd have to move the smock in order to see

15   whether --

16   A.      You could take it and just, I mean, move it, yes.

17   Q.      So, you'd have to move the smock one way or the

18   other in order to see the chest --

19   A.      You'd have to move it, yes.

20   Q.      I just want to make clear.  It's not -- I mean,

21   the smock is covering him --

22   A.      Yeah, the smock is covering him.

23           THE COURT:  Can you let him finish his question

24   before you answer?

25           THE WITNESS:  Oh, I'm sorry.

1   Q.      (BY MR. HICKEY)  It's okay.  We need to do this

2   for the court reporter.  It's not for me or for you.

3   A.      Okay.

4   Q.      We have to be most respectful of her.

5           Okay.  So, just to clarify that, the smock is in

6   fact covering -- it would have covered his front, it would

7   have covered his back, and you would need to move the

8   smock one way or the other in order to see --

9   A.      Yes.

10  Q.      -- if there were any injuries to the chest or to

11  the back; correct?

12  A.      Yes.

13  Q.      Okay.  And when he was placed back in his crisis

14  cell, would he have been wearing a smock or a jumpsuit, or

15  do you know?

16  A.      The only thing I can tell you, he would have been

17  -- he had the same thing on when I took him out.  But if

18  he was on a 10-minute watch or 15-minute watch, most

19  likely he was in a smock.  If he was in a 30-minute watch,

20  which I do not know what he was on, he, he could have

21  possibly had a jumpsuit on.  That's all I can tell you.  I

22  don't know.

23  Q.      Okay.  So, you don't know one way or the other

24  whether he was wearing a smock or a jumpsuit?

25  A.      No.  We'd have to go back and look.  I do not

1    know.

2    Q.    Okay.  And when you wrote here that Inmate Coleman

3    had no visible injuries, did you do any inspection that

4    you recall of his body to see if he had injuries to other

5    parts of his body underneath his clothing?

6    A.    No.  I wouldn't have looked underneath his

7    clothing.

8         MR. HICKEY:  Just a second.  (Pause.)  That's all

9    I have at this time, Your Honor.

10        THE COURT:  Thank you.

11        MR. HICKEY:  Thank you for your time.

12        THE WITNESS:  Yes.

13        THE COURT:  Any redirect?

14        MS. SPILLANE:  No redirect, Your Honor.

15        THE COURT:  Okay.  Mr. Vinson, that completes your

16    testimony.  You may step down.

17        One more witness for the defense today?

18        MS. SPILLANE:  Yes.

19        MR. STRATTON:  Yes.

20        THE COURT:  Do we need a break?

21        MS. SPILLANE:  It's up to you, Your Honor.

22        THE COURT:  Let's take a five-minute break to

23    stretch our legs and come back.  So we'll come back here

24    just a little bit before 3:00.

25        (Conclusion of the testimony of James Vinson.)

1                    REPORTER'S CERTIFICATE

2        I, Christine Dohack LaBuwi, RDR, RMR, Official

3   Court Reporter for the U.S. District Court, Southern

4   District of Illinois, do hereby certify that I reported

5   with mechanical stenography the proceedings contained in

6   pages 1-30; and that the same is a full, true, correct and

7   complete transcript from the record of proceedings in the

8   above-entitled matter.

9

10           DATED this 18th day of October, 2018,

11

12                       s/Christine Dohack LaBuwi, RDR, RMR

13                       Christine Dohack LaBuwi, RDR, RMR

14

15

16

17

18

19

20

21

22

23

24

25