1                    IN THE UNITED STATES DISTRICT COURT
                        SOUTHERN DISTRICT OF ILLINOIS
2

3     DWAINE COLEMAN,                    )
                                         )
4              Plaintiff,                )
                                         )
5     v.                                 )   No. 15-cv-898-RJD
                                         )   Benton, Illinois
6     JAMES VINSON, ET AL.               )
                                         )
7              Defendants.               )

8

                    EXCERPT OF JURY TRIAL PROCEEDINGS
9             **TESTIMONY OF DWAINE COLEMAN - DAY 2**

10               BEFORE THE HONORABLE REONA J. DALY
                    UNITED STATES MAGISTRATE JUDGE
11

                            OCTOBER 3, 2018
12

      APPEARANCES:
13

      FOR THE PLAINTIFF:     Michael J. Hickey, Esq.
14                           Jerina D. Phillips, Esq.
                             Lewis Rice, LLC.
15                           600 Washington Avenue, Suite 2500
                             St. Louis, MO   63101
16                           314-444-7630
                             mhickey@lewisrice.com
17                           jphillips@lewisrice.com

18    FOR THE DEFENDANTS:    Ann M. Spillane, Esq.
                             Brent D. Stratton, Esq.
19                           Office of the Illinois Attorney General
                             100 W. Randolph Street, 12th Floor
20                           Chicago, IL   60601
                             312-814-3000
21                           aspillane@atg.state.il.us
                             bstratton@atg.state.il.us
22
                      Stephanie Rennegarbe, RDR, CRR, CBC
23                           IL CSR #084-003232
                             301 West Main Street
24                           Benton, IL   62812
                              618-439-7735
25                 Stephanie_Rennegarbe@ilsd.uscourts.gov

1                    (Excerpt of Jury Trial Proceedings)

2            ******************************************

3            THE COURT:  Does the Plaintiff wish to call anyone in

4    rebuttal?

5            MR. HICKEY:  Yes, we wish to call Mr. Coleman in

6    rebuttal.

7            THE COURT:  Okay.  Mr. Coleman, if you would step

8    back up to the witness stand.

9            We will swear you in again.  I'm not sure it's

10   necessary.

11           (Plaintiff, Dwaine Coleman, sworn).

12

13                         DIRECT EXAMINATION

14   BY MS. PHILLIPS:

15   Q.  Dwaine, you heard Lt. Mitchell testify he did not recall

16   what happened on November 17, 2014, is that right?

17   A.  Yes, I did.

18   Q.  Do you recall what happened on that day?

19   A.  Yes, I do.

20   Q.  Do you clearly recall what happened on that day?

21   A.  Yes, I do, because it was personal to me.

22   Q.  Do you recall complaining to Lt. Mitchell about the way

23   that you were being treated?

24   A.  Yes, I do.

25   Q.  You complained about the lack of medical treatment?

1   A.  Yes, I did.

2   Q.  And you complained that you weren't allowed a simple glass

3   of water?

4   A.  Yes.

5   Q.  And what was Lt. Mitchell's response to you?

6   A.  Lt. Mitchell told me to follow the grievance procedure,

7   but that if I insisted on declaring a crisis he would take me

8   to segregation.

9   Q.  And did Lt. Mitchell take you to segregation?

10  A.  Yes, he did.  He escorted me to segregation.

11  Q.  Because you continued to complain?

12  A.  He escorted me to segregation immediately.  So, when he

13  testified that he had to wait on signatures, all of that had

14  come afterwards, because he took me to segregation

15  immediately.

16  Q.  And did he tell you that you were being taken to

17  segregation because you disobeyed any order?

18  A.  Yes -- No.  No, no, no, not because I disobeyed any order.

19  Q.  Why did he tell you he was taking you to segregation?

20  A.  He was following through on his threat, you know, because

21  I chose to follow through on my crisis.

22  Q.  And you also heard Lt. Vinson and Blessing say that they

23  don't recall what happened on January 3, 2015, is that right?

24  A.  Yes, I do.

25  Q.  And do you recall what happened on that date?

```
 1   A.  Yes, I recall.

 2   Q.  Okay.  Do you recall Lt. Vinson slamming your head into

 3   the door jam?

 4   A.  Yes, I do vividly.

 5   Q.  Do you recall him removing your cuffs in a way that cut

 6   your wrists?

 7   A.  Yes, I do.

 8   Q.  Do you recall your tooth being chipped during that

 9   incident?

10   A.  Yes.

11   Q.  Do you recall Lt. Vinson attempting to kick you?

12   A.  Yes.

13   Q.  What happened after he attempted to kick you?

14   A.  Another officer once again had intervened.

15   Q.  Do you recall Lt. Vinson putting his hand on your mouth?

16   A.  Yes, he clamped down so hard it was hurting my jaw.

17   Q.  And you recall Defendant Blessing choking you on January

18   3, 2015?

19   A.  Yes, I do.

20   Q.  And why do you think it is that you recall, but Lt. Vinson

21   doesn't recall, Officer Blessing doesn't recall, and Officer

22   Mitchell doesn't recall?

23   A.  I recall because it was personal to me, and to them I was

24   probably just another anonymous inmate coming through.  But,

25   you know, these incidents was personal to me.  That's why I
```

1   recall.

2   Q.  And you just heard Lt. Oehlsen testify that you weren't in

3   any distress on January 3, 2015.  Is that accurate?

4   A.  Yes, I do recall.

5   Q.  Is that accurate that you weren't in any distress?

6   A.  No, it's not.

7   Q.  Can you explain to the jury the way in which you told Lt.

8   Oehlsen you had just been assaulted?

9   A.  I was still excited.  I was at the door waiting on the

10  shift to change so I could tell someone, and it just so

11  happened that Lt. Oehlsen was the first one that came.  I was

12  still having anxiety, still excited about -- agitated about

13  the incident, so Lt. Oehlsen was the first one to come through

14  the crisis area, so I immediately reported it to him.

15  Q.  I want to talk a bit about Nurse Tammy Stevens.  You just

16  sat here through her testimony, is that right?

17  A.  Yes.

18  Q.  Okay.  And you recall seeing her on January 3, 2015, is

19  that right, --

20  A.  Yes.

21  Q.  -- even though she doesn't recall seeing you?

22  A.  Yes, I recall seeing her.

23  Q.  What were you wearing on January 3, 2015?

24  A.  Well, I was in a crisis cell, that's correct, but I saw --

25  I seen the social worker.  I had been in the crisis cell for a

1    while, so I was upgraded to a jumpsuit.  So, with being

2    upgraded with a jumpsuit they give us a blanket and a jumpsuit

3    after being in crisis for a while, and the social worker gives

4    them the okay to upgrade you.  So, I was in a jumpsuit at that

5    time.

6    Q.  So, you were not wearing a smock?

7    A.  No, I was not wearing a smock.

8    Q.  Did Tammy Stevens take off your jumpsuit at any point?

9    A.  No, Tammy Stevens never did anything but take the urine

10   sample when she came into the cell.

11   Q.  Can you explain to the jury how she would have taken off

12   your jumpsuit?

13   A.  Well, the jumpsuit is Velcro, so it comes apart in the

14   front.  So, the only thing she did was unsnapped it and

15   assisted me urinating in the cup.

16   Q.  But she didn't take off the top of your jumpsuit?

17   A.  No, she did not.

18   Q.  So, she did not examine your back or your chest?

19   A.  No, she did not.

20   Q.  And were you screaming and hollering during this incident

21   with Tammy Stevens?

22   A.  Yes, I was still agitated, screaming, and I was still in

23   pain.  So, yes, I was screaming at the time.

24   Q.  Why were you screaming?

25   A.  Because I was still in pain from just being assaulted.

1    Q.  No further questions.

2

3                        CROSS EXAMINATION

4    BY MR. STRATTON:

5    Q.  Good morning, Mr. Coleman.

6    A.  Good morning.

7    Q.  So, you just testified that Lt. Mitchell took you to

8    temporary confinement immediately, correct?

9    A.  He took me to temporary confinement immediately after I

10   talked to him, yes.

11   Q.  So, it was -- And you don't remember -- You don't know

12   what time that was that Lt. Mitchell came to talk to you?

13   A.  No, all I remember is he asked me if I am insisting on

14   declaring a crisis.  I told him I was, and then he took me

15   straight away to confinement.

16   Q.  All right.  So, you don't know whether between the time

17   you had the encounter with Officer Dent at the desk and the

18   time that Lt. Mitchell came to talk to you, you don't know

19   whether Lt. Mitchell got the signatures he needed in that

20   time, correct?

21   A.  No, I was downstairs talking to Lt. Mitchell, so --

22   Q.  He could have gotten those signatures between your

23   encounter with Officer Dent and when he came and talked to

24   you, correct?

25   A.  I mean, Lt. Mitchell told me that if I insisted.  So, if

1   he got the signatures before he told me if I insisted he would

2   take me to segregation, I don't see how it's possible.

3   Q.  Well, if he got the signatures because the ticket made it

4   appropriate for you to go to temporary confinement -- We

5   talked about this yesterday, right?

6   A.  The way the Department of Corrections works is it's kind

7   of impossible for him to get the signatures that fast.

8   Q.  You know that?

9   A.  Yes, because it --

10  Q.  You've watched these officers walk through the facility

11  and you know it's impossible for him to get those signatures?

12  A.  I'm not saying it's impossible, but the way it works, they

13  are not going to get the signatures that fast.

14  Q.  And you were watching him this whole time?

15  A.  No, I'm not saying I was watching him the whole time, but

16  I was sitting with him when he was telling me if I insisted on

17  declaring a crisis I would be going to segregation, and he

18  never went anywhere else after he told me that.

19  Q.  Because he got the signatures before that, correct?

20  A.  I don't know when he got the signatures.

21  Q.  Exactly.  You do not know when he got the signatures?

22  A.  No.

23  Q.  And he probably got the signatures before he came to talk

24  to you and before you got to segregation.

25  A.  It's possible, but, you know, I doubt it.

1    Q.   Okay.  I have no further questions.

2            THE COURT:  Okay.  Mr. Coleman, that concludes your

3    testimony.  You may step down.

4            MR. COLEMAN:  Thank you, Your Honor.

5

6

7

8                        *   *   *   *   *   *   *

9

10   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

11

12   /S/ Stephanie K. Rennegarbe                11/13/2018
     Certified Shorthand Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25